**TRANS WORLD AIRLINES, INC., Plaintiff,**

v.

**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS ("IAM") AFL-CIO; et al., Defendants.**

**No. 86–6031–CV–SJ–6.**

United States District Court, W.D. Missouri, St. Joseph Division.

March 18, 1986.

Murray Gartner, Proskauer Rose Goetz & Mendelsohn, New York City, Paul E. Donnelly, Stinson, Mag & Fizzell, Kansas City, Mo., for plaintiff.

Michael D. Gordon, Jolley, Walsh, Hager & Gordon, Kansas City, Mo., for defendants.

## MEMORANDUM OPINION

SACHS, District Judge.

On March 11, 1986, a preliminary injunction was entered, after a hearing the previous day, enjoining the defendant international union (IAM), its district lodge and affiliated local unions and their named officers, from engaging in a sympathy strike or work stoppage against the plaintiff airline (TWA), employer of their members. IAM represents machinists, who serve in various capacities as airline ground crews and as mechanics who keep TWA's aircraft serviceable. The sympathy strike, essentially consisting of a refusal to cross picket lines to perform the machinists' ordinary work, was in support of a post-impasse strike by flight attendants whose union (IFFA) has been struggling to maintain favorable wages, working rules and conditions of employment to the extent possible as TWA struggles to avoid serious operating losses and regain profitable operations.

The primary strike by IFFA against TWA began Friday, March 7, 1986, in anticipation of expected wage cuts of 22% and other adverse changes in rules and conditions of employment. That date was the first day after a thirty-day "cooling off" period established by the National Mediation Board. TWA and IFFA then acquired the lawful right to act unilaterally in support of economic objectives.[1] Within hours, IAM officials authorized a sympathy strike, announcing a recommendation that members not cross the IFFA picket lines. P.Exh. 9.

The current legal controversy arises because IAM had previously made its peace with TWA's new management, accepting a wage cut of 15%, and reaffirming a no-strike provision that has been in the collective bargaining agreements of the parties for almost forty years. The provision consists of two sentences, the most pertinent language of which is emphasized:

> The Company will not lock out any employee covered hereby and *the Union will not authorize or take part in any*

*work stoppage,* strike, or picketing of Company premises during the life of this Agreement *until the procedures for settling disputes involving employees covered by this Agreement* and as provided by the Railway Labor Act *have been exhausted.* The Company reserves the right to discipline, including discharge of any employee taking part in any violation of this provision of the Agreement.

TWA contends this language (and other provisions not necessary to this ruling) guarantee it against loss of the IAM workforce when another union is on strike; IAM contends the language does not prohibit it from supporting other lawful strikes. IAM further contends a federal court cannot enjoin strike action, at least under the present circumstances, by virtue of the Norris-LaGuardia Act, 29 U.S.C. §§ 101 *et seq.* TWA contends that strike action during the processing of a "minor dispute" under the Railway Labor Act (45 U.S.C. §§ 151 *et seq.*) may be enjoined. *Brotherhood of Railway Trainmen v. Chicago River & I.R. Co.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957).

This lawsuit seeking injunctive relief was filed by TWA before 8:00 a.m. on March 7, 1986, and TWA immediately applied for a temporary restraining order, having duly notified IAM's counsel. After hearing argument in open court that morning, I denied relief over the weekend but scheduled a hearing on TWA's motion for a preliminary injunction for Monday afternoon, March 10.

My personal reading of the no-strike clause was and is favorable to IAM, in that the words, in context, appear only to forbid union authorization of strikes and work stoppages that are subject to the grievance procedures of the collective bargaining agreement (or during bargaining) rather than strikes and work stoppages in general.

Based on materials presented to me after the hearing on the temporary restraining

---

1. There is, however, companion litigation before me in which IFFA seeks an injunction to restore the status quo existing before its strike, on the theory that TWA has not engaged in good faith bargaining.

order, however, I have concluded that construction of the clause in question has become reasonably settled in practice in favor of TWA and other airlines, at least in the three formal rulings that have been brought to my attention and that are discussed below. It has been formally construed and will very likely be construed in the future as a prohibition against sympathy strikes and work stoppages. Therefore, I anticipate that TWA will win its current grievance pending before the System Board of Adjustment and is entitled to relief pending arbitration.

Arbitrators are likely to follow the practical concept that "it is more important that the applicable rule be settled ... than that it be settled right." *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406, 52 S.Ct. 443, 447, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting); *Keasler v. United States*, 766 F.2d 1227, 1232 n. 16 (8th Cir.1985). Collective bargaining agreements can be changed by the parties, rather than by adjudication or arbitration, if the change is advocated with persistence and sufficient economic power.

## I.

■ The first question to be ruled is the court's jurisdiction, as affected by the Norris-LaGuardia Act. The court of appeals for this circuit has squarely ruled the issue in favor of jurisdiction. *Northwest Airlines, Inc. v. Air Line Pilots Ass'n.*, 442 F.2d 251, 255 (8th Cir.), *cert. denied*, 404 U.S. 871, 92 S.Ct. 70, 30 L.Ed.2d 116 (1971). IAM contends, however, that this ruling is undercut by the Supreme Court's later decision that sympathy strikes cannot be enjoined pending arbitration in cases governed by the Labor-Management Relations Act. *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). Justice White's majority opinion, however, noted the generally permissive national policy relating to strikes, which is hardly the thrust of the Railway Labor Act. Moreover, the Court emphasized the contractual nature of arbitration under the Labor-Management Relations Act, and the expectation of the parties that their contract disputes would be resolved without litigation. Under the RLA the parties have no choice; their contract disputes must be submitted to the System Board of Adjustment (45 U.S.C. § 152, First), and it cannot be said that the parties elected not to litigate or had any particular expectation that litigation would not be filed in aid of arbitration.

The only appellate decision since *Buffalo Forge* that is squarely on point sustains jurisdiction to enjoin sympathy strikes in the airline industry. *Trans International Airlines, Inc. v. International Brotherhood of Teamsters,* 650 F.2d 949 (9th Cir. 1980). Without dissecting that tortured litigation, it is sufficient to observe that it lends some support to reaffirming the Eighth Circuit ruling in *Northwest Airlines.* This litigation is clearly not barred by the Norris-LaGuardia Act, as presently construed in this circuit.

## II.

■ The standard that TWA must satisfy, before obtaining a preliminary injunction, is set forth in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir.1981) (en banc). District courts must consider the threat of irreparable harm, the balance of hardship between the parties as that may be affected by the granting or denial of an injunction, plaintiff's probability of success "on the merits," and the public interest.

It has been demonstrated that a sympathy strike by machinists will prove drastically harmful to TWA in a financial sense, but the measure of that harm is not readily calculable in a future damage suit or in reparations in arbitration. The current IFFA strike has been costing TWA millions of dollars daily in lost revenues, although it is recouping some $250,000 daily in reduced wages of flight attendants. The harm of a sympathy strike is almost impossible to extricate from the harm of the IFFA primary strike. Suffice it to say that the Kansas City Overhaul Base would probably close and TWA's aircraft would gradually become unserviceable if the IAM members remained off the job, as about 95% of the

Overhaul Base employees did on Friday and Monday, March 7 and 10. Contracting out the work of the Overhaul Base would generally take a year's planning, according to the testimony, and it is unpredictable how TWA would cope with the growing emergency of a successful machinists' strike. Discontinuance of all service is possible, as is the total dismantling of TWA as an airline. According to Senior Vice President Nichol, that was the plan if the pilots struck.

No material harm to the interests of the machinists has been demonstrated from granting the preliminary injunction. Informational material produced by IAM speculates that if the flight attendants surrender 17–22% of their income (the range of TWA negotiations), then IAM, which has surrendered 15%, may be targeted for further reductions. P.Exh. 6. But IAM has just entered into a new contract, and no effort was made at the hearing to give substance to the theory. The balance of hardship greatly favors granting an injunction.

■ While TWA has made a greater demonstration of a public interest in granting relief than IAM has shown to the contrary, for purposes of this litigation I will treat the issue as being in balance. There can be little question but that IFFA is in serious or desperate need of allies, and the preliminary injunction has a very harmful impact on IFFA's lawful strike. This is deeply troubling. There is, however, considerable public interest in keeping a major air carrier operational, and TWA's financial future may be significantly dependent on cutting costs. It would be inappropriate to express an opinion favoring one side or the other in the IFFA strike, and I need not rule the public interest issue in reaching my ultimate conclusion.

Appraising TWA's likelihood of success on the merits has several layers of difficulty. TWA asserts I should simply find the contract ambiguous, thereby concluding that TWA has soundly invoked the jurisdiction of the System Board of Adjustment, and then automatically enjoin an effort to coerce a result prior to the ruling in arbitration. Four justices of the Supreme Court have concluded, however, that if there is federal jurisdiction to enjoin a sympathy strike pending arbitration, the district judge should not act without sufficient assurance that the employer seeking the injunction "will win before the arbitrator." *Buffalo Forge, supra*, 428 U.S. at 412, 96 S.Ct. at 3150. Justice Stevens declared in his dissenting opinion that "the judge should not issue an injunction without convincing evidence that the strike is clearly within the no-strike clause." 428 U.S. at 431, 96 S.Ct. at 3159.[2]

The only appellate decision since *Buffalo Forge* that deals with jurisdiction to enjoin sympathy strikes under the Railway Labor Act follows the Stevens opinion in concluding that there must be consideration by the district judge of whether the union has a contractual right to engage in a sympathy strike. *Trans International Airlines, supra*, 650 F.2d at 966. I agree with this view, although the *Northwest Airlines* decision in this circuit does not expressly require examination of the ultimate merits in arbitration. The late Judge Friendly was surely correct in saying it would be "inequitable in the last degree to grant an injunction pending arbitration ... on the basis of a claim which although arguably arbitrable was plainly without merit." *Hoh v. Pepsico, Inc.*, 491 F.2d 556, 561 (2d Cir.1974).

The text of the TIA opinion and footnote 13 appear to be internally inconsistent as to the standards to be applied. The text would require the union to satisfy the court that it has a right to disrupt operations; the footnote would require a finding that the strike clearly violates the no-strike clause before an injunction could issue.

---

**2.** Justice Stevens made the further pertinent observation that when an arbitrator disagrees with the judge's tentative view, "the arbitrator's determination would govern, provided it withstands the ordinary standard of review for arbitrators' awards." *Id.*, n. 27. This statement bears repeating as the parties go before an arbitrator. While I am necessarily engaged in prediction, I am not writing to influence the decision in arbitration.

650 F.2d at 966. This difficulty in stating satisfactory standards of persuasion can probably be resolved by invoking the flexible rule of *Dataphase,* where the need to show likelihood of success decreases as other factors favoring relief increase. 640 F.2d at 113. A " 'flexible interplay' among all the factors considered" has been recognized in other circuits. E.g., *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189, 196 (4th Cir.1977).

### III.

■ Because TWA has made a strong showing of irreparable harm and would, in relative terms, suffer much more extensively from an erroneous ruling, it is enough for an injunction in this case if I conclude, as I did in the injunctive order, attached hereto as an appendix, that "it is very probable" that TWA will prevail in arbitration. My conclusion rests on two System Board of Adjustment rulings construing IAM no-strike provisions in the airline industry that contain the same pattern of language, and a current district court opinion to the same effect. NWA–IAM System Board of Adjustment, December 14, 1970; NWA–IAM System Board of Adjustment, September 2, 1983; *IAM v. Alaska Airlines, Inc.,* No. C85–1671M (W.D. Wash. Feb. 5, 1986) (McGovern, Ch. J.). The most significant of these rulings is the 1970 decision. Exh. A, Plaintiff's Supplemental Suggestions in Support of Motion for Preliminary Injunction, filed March 10, 1986. The ruling is mentioned in the IAM portion of the *Northwest Airlines* litigation (442 F.2d at 251) and the no-strike provision in the IAM contract with that airline is quoted by the court of appeals. *Northwest Airlines v. International Association of Machinists and Aerospace Workers,* 442 F.2d at 244 (8th Cir.1970).

The TWA–IAM no-strike provision, quoted earlier, forbids the authorization of work stoppages until exhaustion of "the procedures for settling disputes involving employees covered by this Agreement." The NWA–IAM no-strike provision forbids such conduct until exhaustion of "the procedures for settling disputes as provided

herein." Both provisions contain the same pattern of language. TWA contends the no-strike clause is comprehensive, with merely a "temporal" qualifier. My problem in reading the clause in favor of TWA is that no one supposes that employees represented by IAM could file and process grievances on behalf of the flight attendants, or to have the IFFA contract established by arbitration. Therefore, the exhaustion referred to will never occur and the TWA construction produces an anomaly when applied to disputes that do not directly concern the rights of employees covered by the IAM contract. With this context in mind, if presented as a new issue, I should suppose that arbitration would favor IAM. This view is buttressed when I read in the 1970 ruling that the essential language in question was proposed by IAM in 1946. The authors seem to me to have written a sentence that begins with an apparently strong no-strike commitment, but then rather carefully limited its meaning by the concluding clauses. Further research shows that my initial reading of the provision may well be conventional, at least as an abstraction, in labor relations. *See, e.g., NLRB v. Southern California Edison Co.,* 646 F.2d 1352, 1359, 1367 (9th Cir.1981), enforcing a Labor Board ruling, 243 NLRB 372 (1979). *See* the ALJ's analysis, 243 NLRB at 381. *Compare,* however, an earlier ruling where a prohibition on strikes "until the entire grievance procedure has been exhausted" was construed in light of the entire contract to mean "in effect, that on matters not subject to the grievance procedure there can be no strike." *Alliance Mfg. Co.,* 200 NLRB 697, 700 (1972).

Whatever may have been the original intention of the IAM sponsors of the no-strike provision, it was apparently quickly forgotten by IAM officials. According to the 1970 ruling, which could doubtless be verified in the pending arbitration proceeding, in 1953 the General Chairman of IAM instructed members to remain on the job during a strike by another union, and referred to the no-strike clause as a basis for his instructions. The 1970 ruling also re-

fers to four unsuccessful IAM efforts between 1956 and 1963 to induce Northwest Airlines to accept a provision permitting employees to refrain from crossing picket lines. The opinion treats these negotiations as attempts to change the agreement, not simply to clarify it.

TWA also relies on an early interpretation of the no-strike provision in its favor, by IAM International President P.L. Siemiller. On November 16, 1965, he acknowledged in writing that IAM members must report to work under the no-strike provision, and cannot engage in a sympathy strike supporting IAM employees of another employer.

Both parties rely on bargaining efforts by the other to obtain more favorable language. I consider these to be efforts to clarify the no-strike provision rather than an acknowledgement that the current agreement is unfavorable to the party seeking a change. Such proposals tacitly concede ambiguity but that is all.

IAM's principal contention that TWA has conceded the correctness of the union's current position on the no-strike provision relates to a local dispute in 1973, when TWA closed the Overhaul Base in Kansas City during a strike by IFFA and sympathy actions by IAM members. Litigation ensued over unemployment benefits. The machinists claimed they wanted employment but were locked out; TWA claimed they were engaged in a voluntary work stoppage. *See Trans World Airlines v. Labor and Industrial Relations Commission,* 627 S.W.2d 335 (Mo.App.1982). It is speculative to conclude that TWA management tacitly acknowledged in 1973 the contract right of IAM employees to honor an IFFA picket line. Local TWA attorneys did, however, make embarrassing arguments in briefs filed in 1981. In several bursts of rhetoric, supporting their contention that IAM members were engaging in a voluntary work stoppage, they said the employees had a right to take such action. *See, e.g.,* Def.Exh. 2. It is not clear, however, whether counsel were considering the no-strike language in their commentary and I will not infer that they had researched the matter by reviewing the Siemiller letter and the Northwest Airlines material. Since the material here presented by TWA was harmful to the position being taken in resisting unemployment benefits, the statements in the briefs either lacked candor or lacked the degree of preparation that has occurred here. The latter situation seems much more probable, which renders the advocacy harmless in this case.

The union has not called to my attention any instance in which airline officials have acknowledged that IAM may engage in a sympathy strike or in which a System Board of Adjustment decision involving the IAM no-strike provision (in its various similar forms) has favored IAM.

 Under the circumstances I consider it quite likely that the arbitration decision will follow precedent and will favor TWA. Perhaps arbitrators generally do not consider themselves bound by precedents. Arbitration of grievances is sometimes likened to the dispensing of "rough and ready equity" in the manner of an "ancient oriental cadi." [3] In the present instance, however, we are dealing with a long-standing formula of words, adopted at the highest levels by IAM and airline officials. Consistency of construction of that language is important to stable labor relations in the industry. It would seem strange and would prove confusing and unsettling to give similar language varying meaning as between different airlines dealing with IAM, or in different local controversies. I would therefore expect the arbitrator to reject what may have been IAM's original intention in 1946 and what may be a conventional construction of the language in other industries and to follow the arbitration precedent of 1970, with the 1983 reaffirmation referred to earlier, and the recent ruling of Chief Judge McGovern.

---

**3.** These figures of speech are drawn from unrelated litigation. *Clarke v. Harleysville Mut.*

*Casualty Co.,* 123 F.2d 499, 502 (4th Cir.1941).

For the reasons stated above, the attached preliminary injunction order was entered last week.

## APPENDIX

### PRELIMINARY INJUNCTION

This cause coming on to be heard upon plaintiff's Motion For a Preliminary Injunction, the Verified Complaint and the affidavits of James R. Cato, Jerry Nichols, Thomas J. Kelly, Gene Spina and Kim Golden, sworn to March 6, 1986, and after hearing the testimony of witnesses in open court on March 10, 1986, in support of the allegations of the said Complaint and testimony in opposition thereto, and it appearing to the court from the Verified Complaint, and the said testimony taken by the court, that a preliminary injunction should issue because defendants are engaged in a sympathy strike or work stoppage in alleged violation of their contractual obligations, and the court having become persuaded, for reasons set forth in an informal Memorandum to the Parties, filed today, that it is very probable that the System Board of Adjustment will rule that the acts complained of violate the IAM's contracts with Trans World Airlines, Inc. ("TWA") and thus the Railway Labor Act; and that the acts complained of have occurred and will continue unless restrained by order of this court; that injunctive action is required to preserve unimpaired the effective jurisdiction of the System Board of Adjustment; that such acts have caused and will cause immediate and irreparable injury, loss or damage to the plaintiff in that said acts, if not restrained, are likely to prevent plaintiff from operating its airline on schedule without interruptions in service or at all; that as a result of such acts, plaintiff will be deprived of substantial revenues and will suffer immediate and severe injury to its air carrier operations and to its reputation as a reliable and efficient carrier by air, in that the consequence of defendants' acts will likely be to produce substantial disruption of its operations; that the threat of such disruption will cause plaintiff to lose market share on its routes, the recovery of which will be slow and uncertain; that members of the traveling public will be seriously inconvenienced; that damage to plaintiff resulting from such acts cannot be wholly estimated, calculated or compensated in money, and will be continuing and that, therefore, the damages which plaintiff will so sustain will be immediate, substantial and irreparable, and the court being satisfied that a preliminary injunction should issue because of the acts alleged in the Verified Complaint, and on the court's findings of fact, it is, therefore, by the court this 11th day of March, 1986;

ORDERED, that pending further order of this court,

Defendants International Association of Machinists and Aerospace Workers, AFL–CIO, IAM District Lodge 142, IAM Local Lodges 650, 949, 1056, 1111 and 1320, William W. Winpisinger, John F. Peterpaul, William Scheri, Tim Connolly, Frank Score, William O'Driscoll, Carl W. Laws, Albert C. Calhoun, Clifford E. Cranfill, Harold L. Johannesen, Gary G. Poos, Ed Imondi, Edward G. LaClair, Tom Higginbotham, Smithie Weathers, Wayne Clover, John Ruggiero, Rick Jean, Gary L. Adkins, J.M. Marino, D.M. Evans, Jim Sprang, Maurice Cantillon, Bobbi Spotswood and Robert DiForie, all other officers, agents and employees of said defendants, all persons acting in concert and participation with said defendants, and each of them, be, and they hereby are, immediately restrained and enjoined from in any manner, or by any means, participating in or authorizing any IAM-represented employee to participate in any work stoppage, strike, or picketing of TWA premises; it is further

ORDERED that the defendants IAM, IAM District Lodge 142, and IAM Local Lodges 1650, 949, 1056, 1111 and 1320, and each of them, forthwith shall use all means at their command, including but not limited to postings on bulletin boards at IAM and TWA premises, and "hotlines" customarily used at IAM locations, to communicate the following message to its officers, agents, members and IAM-represented employees of TWA:

(a) any authorization of a sympathy strike, work stoppage, picketing or partic-

ipation in the strike against TWA by the Independent Federation of Flight Attendants ("IFFA") by IAM-represented employees of TWA and any IAM advice or instructions to IAM-represented employees of TWA to honor picket lines have ceased and are withdrawn until further notice;

(b) a grievance proceeding has been initiated to decide whether the IAM has any right to engage in a sympathy strike or work stoppage under its present contracts with TWA and is being processed with the objective of having a decision on that question by April 1, 1986;

(c) all IAM-represented employees of TWA are free to perform their customary work for TWA and no such employee will be subject to any disciplinary action by the IAM for working;

(d) any IAM-represented employee of TWA who honors an IFFA picket line or otherwise fails or refuses to work, or engages in picketing of TWA's premises, is at risk of being subjected to disciplinary action by TWA, as provided in the TWA–IAM contracts; and it is further

ORDERED that the grievance set forth in the letter dated March 6, 1986 from Jerry Nichols, Senior Vice President, Ground Operations, TWA, to William O'Driscoll, Acting President-General Chairman, International Association of Machinists and Aerospace Workers, District Lodge 142, be submitted by TWA and the IAM to the System Board of Adjustment without delay. Specifically, the court requires: (1) That representatives of the IAM and TWA meet no later than 11:00 a.m., Thursday, March 13, 1986 for the purpose of selecting the neutral member of the Adjustment Board. This neutral should be one who can and will hear the dispute without delay. (2) That, failing agreement by 3:00 p.m. Thursday, March 13, 1986, as to a neutral, the parties request the National Mediation Board to appoint a neutral. A copy of this order and the request to appoint the neutral shall be hand-carried to the appropriate office of the National Mediation Board by representatives of the parties no later than Friday, March 14, 1986. (3) That both parties will request the neutral to set hearing dates to the end that a prompt decision on the grievance will be rendered. This court sees no reason why a decision on the grievance cannot be issued by Tuesday, April 1, 1986. (4) That a copy of the System Board of Adjustment decision be filed by the moving party with this court immediately after it is issued. It is further

ORDERED, that nothing in this order shall be construed to prohibit other, lawful actions by defendants, including providing IFFA access to facilities owned or operated by the IAM (other than on TWA premises). It is further

ORDERED, that, the plaintiff having given bond as required by law in the sum of $10,000 and the same having been approved by the court, this preliminary injunction is of full force and effect immediately; and it is further

ORDERED, that this preliminary injunction shall remain in full force and effect until further order of the court; and it is further

ORDERED that personal service of a copy of this Order on Michael D. Gordon, Esq., attorney for defendants, on or before 6:00 p.m., March 11, 1986 shall be good and sufficient service as to defendants, International Association of Machinists and Aerospace Workers, AFL–CIO, IAM District Lodge 142, IAM Local Lodge 1650, IAM Local Lodge 949, IAM Local Lodge 1056, IAM Local Lodge 1111, IAM Local Lodge 1320, William W. Winpisinger, John F. Peterpaul, William Scheri, Tim Connolly, Frank Score, William O'Driscoll, Carl W. Laws, Albert C. Calhoun, Clifford E. Cranfill, Harold I. Johannesen, Gary G. Poos, Ed Imondi, Edward G. Laclair, Tom Higginbotham and Smithie Weathers.

Issued at Kansas City, Missouri at 5:50 p.m. on this 11th day of March, 1986.

/s/ Howard F. Sachs
United States District Judge