The INDEPENDENT FEDERATION OF FLIGHT ATTENDANTS, an Unincorporated Labor Organization, Plaintiff,

v.

TRANS WORLD AIRLINES, INC., et al., Defendants.

No. 86–6030–CV–SJ–6.

United States District Court, W.D. Missouri, St. Joseph Division.

March 9, 1988.

William A. Jolley, Doyle T. Pryor, Scott A. Raisher, Jolley, Walsh, Hager & Gordon, Kansas City, Mo., for plaintiff.

Murray Gartner, Proskauer, Rose, Goetz & Mendelson, New York City, Michael A. Katz, Trans World Airlines, Inc. Legal Dept., New York City, Paul E. Donnelly,

Stinson, Mag & Fizzell, Kansas City, Mo., for defendants.

### REVISED OPINION [*]

SACHS, District Judge.

This lawsuit was filed two years ago by the union representing some 6,000 flight attendants (IFFA) then employed by the defendant airline (TWA). It sought an injunction under the status quo provisions of the Railway Labor Act (45 U.S.C. § 152, Seventh) against implementation by TWA of proposed wage reductions and adverse changes in work rules. TWA was presumptively authorized to implement the changes, however, after March 6, 1986, the end of a cooling-off period scheduled by the National Mediation Board at the conclusion of contract negotiations. 45 U.S.C. § 155, First.

The court denied a temporary restraining order after hearing presentations from counsel for the parties, and urged the parties to attempt to resolve their differences on the remaining day before the parties were planning self-help. Such last minute settlements are not uncommon; in this instance, however, there were apparently unbridgeable differences between the parties, particularly regarding work rules governing the lifestyle of flight attendants. Further attempts to negotiate an agreement failed, and implementation by TWA, accompanied by a flight attendants' strike, occurred on March 7, 1986. After a brief reduction in service, TWA was able to maintain full operations by hiring an adequate number of substitute flight attendants as permanent replacements and by using crossover flight attendants. IFFA

offered unconditionally in mid-May to return to work under the new conditions imposed by TWA. Fewer than 200 of the full-term strikers were accepted back by TWA. Practically all of the pre-strike work force was displaced.[1] Wages have been reduced by 22% (some $44 million), and the total saving achieved by TWA may be roughly estimated at $100 million annually.

The present case has been tried sporadically, as soon as the parties were ready, from November 1986 to March 1987, on Count I of the Third Amended Complaint, filed in mid-July 1986. Briefing and argument on TWA's motion to dismiss at the end of plaintiff's proof extended into September 1987. Although Count I contains some allegations serving a dual purpose, and seeks some relief beyond a general reinstatement of full-term strikers, the main thrust of the Count and of the trial deals with a contention that the strikers were "unfair labor practice strikers" who are entitled to return to their jobs after the strike, displacing all replacements, and enjoying back pay entitlement (at a rate that might be estimated at perhaps $2 million per week) from the offer to return in May 1986, by analogy to rules established under the National Labor Relations Act. Bad faith in bargaining is the general allegation.

At the conclusion of plaintiff IFFA's presentation of its evidence, defendant TWA moved for dismissal of the claim, pursuant to Rule 41(b), Fed.R.Civ.P. Unlike the appraisal made at that stage in a jury case, the court's duty is to evaluate the evidence presented with the same critical analysis that would be made by the ultimate trier of

---

[*] This opinion supersedes the memorandum filed March 3, 1988, and contains minor revisions and corrections. The prior order denying general reinstatement of full-term strikers remains in effect, for purposes of determining appeal time.

1. TWA advises, however, that some 743 full-term strikers were rehired from April–July 1987. This court has, moreover, ordered TWA to reinstate some 463 full-term strikers, whose places were filled by employees still in training school at the end of the strike. The Court of Appeals has directed reinstatement of perhaps

double that number of full-term strikers having seniority over "junior crossovers." Persons interested in a full review of the background of this case and related litigation should examine *TWA v. IAM*, 629 F.Supp. 1554 (W.D.Mo.1986); *TWA v. IFFA*, 640 F.Supp. 1108 (W.D.Mo.1986), *affirmed* 809 F.2d 483, *cert. granted* —— U.S. ——, 107 S.Ct. 3183, 96 L.Ed.2d 671 *affirmed* by equally divided vote, —— U.S. ——, 108 S.Ct. 1101, 99 L.Ed.2d 150 (1988); and *IFFA v. TWA*, 643 F.Supp. 470 (W.D.Mo.1986), *affirmed in part, reversed in part*, 819 F.2d 839, *cert. pending*.

fact at the conclusion of the case. *Lang v. Cone*, 542 F.2d 751 (8th Cir.1976); *Palmentere v. Campbell*, 344 F.2d 234, 237 (8th Cir.1965); *White Industries v. Cessna Aircraft Co.*, 657 F.Supp. 687, 694 (W.D.Mo. 1986). For reasons stated below, TWA's motion will be granted. IFFA's claim for general reinstatement will be denied.

## I. FACTS

A. A general statement of factual findings, from the evidence already adduced, will be set forth in this section of the opinion, with the understanding, however, that other factual statements made throughout the opinion are deemed pertinent to the conclusions. The parties have supplied over 800 pages of proposed findings and narrative statements and arguments concerning the facts, emphasizing their conflicting conclusions. This court has attentively listened to the evidence and oral arguments now comprising some 7,000 pages of transcript and has immersed itself in documents and designations from depositions not read into evidence. It is deemed unnecessary and inexpedient to further delay a ruling by articulating comparable detailed discussions largely directed toward rehearsing the negotiating postures and contentions of the parties. To the extent the Court of Appeals may wish to probe deeper into certain factual issues, the materials supplied by the parties as proposed findings will be useful as a guide or index to the evidence.

It is this court's view that the great bulk of the materials would be most pertinent to an "interest arbitration" proceeding, in which a neutral party would make a determination from all material supplied what appropriate changes should have been made in wages, fringe benefits and work rules. While not irrelevant to a decision on the reasonableness of bargaining positions and tactics and the ultimate issue of intent to enter into a new collective bargaining agreement, it is believed that a summary review will suffice for present purposes. While there were of course different ways to try this case I am not critical of the parties for presenting so much detail, given the importance of the result. Another

month of trial time could be foreseen, if TWA were to fully develop its defenses.

IFFA has been the exclusive bargaining representative of TWA flight attendants since April 1977. Other unions represented the flight attendants since the 1940s. The first IFFA–TWA contract was signed in October 1978. The first agreement was subject to amendment beginning in 1981, but negotiations continued into 1983, when the parties agreed on a 31% wage increase over three years, retroactive for two years. The printed replacement contract, referred to in litigation as the "Red Book," is the latest completed contract between the parties. It was scheduled to remain in effect at least until July 31, 1984 (generally referred to by the parties as the "amendable date").

TWA sought mid-term concessions valued at $33 million but the parties were unable to reach agreement. Bargaining on Red Book changes began after TWA served a notice of intended changes in February 1984.

From the beginning of negotiations TWA made known that it was seeking work rules changes that would create a "new lifestyle" for its flight attendants; it also initially sought salary concessions.

IFFA counsel Jolley prepared a memorandum to his clients suggesting negotiating strategy, acknowledging that concessionary bargaining by IFFA would be the major subject matter of negotiations and stating that IFFA's posture should be one of "close and cautious scrutiny." He urged IFFA to adopt a stance of "cautious willingness to listen and entertain, but which places the burden of persuasion on TWA." He noted the possibility that "at some point [IFFA may] be forced to file a lawsuit to compel TWA to provide us with … necessary and relevant information." IFFA's president, Victoria Frankovich, is the only member of the negotiating committee who seems to have personally reviewed the Jolley memorandum.

IFFA's general goal was to postpone adverse changes in the contract for as long as possible, and to obtain some improvements

in the agreement. It was generally supposed that "time is on our side" (Exh. 22, p. 060337) since the contract was considered to be favorable and TWA's economic prospects were believed by IFFA to be improving.

Having failed to obtain mid-term concessions, TWA's initial bargaining technique in early 1984, under the immediate direction of its chief negotiator, J.W. Hoar, was designed to hurry the process toward agreement by July 31, 1984. TWA at that time had a maximum objective or "wish list" of changes in work rules and wages that would result in a 25% reduction in flight attendant costs for an annual saving of some $64 million.

During April 1984, IFFA sent a questionnaire to its members itemizing TWA proposals for work rules changes and obtained results showing widespread opposition to such changes. In the early negotiations IFFA continuously sought detailed explanations of the proposed changes and generally received responsive replies in operational terms but frequent resistance from Hoar to questions seeking financial and economic estimates and details. For example, on one occasion the candid notes of TWA negotiating team member Murphy (acknowledged to be careful and legible, Doc. 218, n. 29) reflect Hoar's statement: "I do not intend to get into what relationship one proposal has on the other, or what each individual proposal will yield what $ savings or headcount. Recall in the past, this exercise led to wrong conclusions. These approx. figures are subject to changes. We will give you no more figures than that [referring to an $8 million insurance cost]." Exh. 22, pp. 060046–7. In another exchange typical of the early negotiations, Hoar said, "Xcept IAM, whom we intend to ask, all other groups have given." Frankovich asked, "By 25%?" Hoar replied, "U are seeking an issue for PR to F/As." *Id.*, pp. 060058–9.

On May 8, 1984, Hoar stated that because the positions of the parties were so divergent, TWA had applied for mediation. A mediator was appointed in July.

In June 1984, TWA's president C.E. Meyer, Jr., made a presentation to the negotiating committee, tending to show that TWA had suffered an operating loss of $72 million in the first quarter of 1984, placing it "dead last" among major carriers. He also presented information tending to show that TWA's flight attendant costs were the highest in the industry and over 23% above the industry average for the major airlines, a dollar value of some $44.2 million annually. While IFFA continues to question this and other economic data supplied by TWA (Exh. 78, a handout on 7/19/84) it has not presented contrary materials on these points or anything to dispute TWA's good faith belief in the Meyer presentation.[2]

Meyer also stated that between 1978 and 1984 TWA's total flight attendant pay and benefits annual cost per employee increased from about $20,000 to $44,000, or 120%, during a period when pilot costs had increased by 49% and mechanic costs had increased by 79%. Without conceding or disproving the accuracy of these points, IFFA contends that the comparisons are irrelevant in that flight attendant benefits lagged behind the other groups prior to 1978. A TWA publication in April 1984, reporting these figures (not shown to have been protested by IFFA) acknowledged that "it might be said with some justification that some have moved faster because they felt they had farther to go." Exh. 69.

There was no significant progress in negotiations until early 1985. Based in part upon TWA's profit of $30 million for 1984 a management decision was made to "go for a deal" by significantly reducing demands. A new comprehensive proposal was presented on February 22, 1985. Apparent leadership in this major move was provided by then-executive vice president Richard D. Pearson who became president later in 1985 but began losing influence as Carl

**2.** An IFFA consultant reported to it in August 1984, that available comparative figures showed TWA's international flight attendant costs were 34% above the industry average and domestic costs were 21% higher. Exh. K at 2. The figures disregard People Express and Southwest. *Id.* at 4. While there are reasons to question the industry figures, nothing better is available.

Icahn's ownership interest strengthened during 1985.[3]

The proposal by TWA in February 1985 reduced the value of its demands by approximately one-half. The new proposal completely eliminated a demand for a 16% wage reduction (worth approximately $32 million annually without considering fringe benefits) and deleted some 17 proposals for work rule, fringe benefit and contract changes. Pearson "felt" that the proposal went "about as far as we can go" and told Frankovich it should serve as a "framework" for an agreement. Some TWA officials believed the reduction in its demands went too far; Pearson defends the reduction and characterizes some of the withdrawn demands as "very harsh" and probably beyond the range of demands that IFFA representatives could agree to and obtain membership approval.

IFFA did not react favorably to the greatly moderated demands by TWA. During the final month of negotiations in the spring of 1985, IFFA representatives made minimal requests for further information. The last specific and generalized requests seem to have been on April 11. Exh. 22, pp. 060442, 060447–455. Instead, IFFA stood firm in resisting TWA's proposals. Revealing statements made during this period included the following: "The changes you are demanding will not be accepted by our work force." Exh. 22, p. 060474. "We like what we have and we want to keep it." *Id.*, p. 060461. "As TWA rises in the industry, the need to grant concessions will become more difficult. You have previously rejected, by design/miscalculation our previous offers." *Id.*, p. 060465. Responding to one of the more important proposals, regarding "Flex Cap" (scheduling and overtime flexibility), when TWA argued that an IFFA counter-proposal was addressed to domestic flights only, whereas TWA claimed it had demonstrated inefficiencies in international flights, IFFA responded, "We did not want to move at all. We moved on Domestic even though we did not want to do so. Those are our answers." *Id.*, p. 060460. Previously the statement was made, "We think Intl is fine the way it is. Intl FAs like it." *Id.*

The negotiating stance of IFFA during the last month of bargaining in early 1985 is reminiscent of Hoar's brusque disregard of IFFA's concerns in early 1984. Despite the apparent deadlock, Pearson believed the parties had reached "manageable" differences where persuasion by the mediator might bring about an agreement, presumably within the "framework" of TWA's February proposals.

IFFA sought release from further negotiations in May 1985. Such a release by the National Mediation Board would have started a 30–day countdown and the possibility of a strike during the summer season of 1985, the "best possible time" to exert pressure on TWA because of its dependence on profitable overseas travel. Such a contingency had been forecast by Frankovich in March. In May 1985, IFFA sought and received from its members "overwhelming authorization to strike."

Simultaneously with the request for a release from negotiations, IFFA prepared and sent to TWA a lengthy request for detailed financial information about TWA's proposals. Exh. 131. The negotiation record of the previous month makes it entirely unlikely that IFFA was urgently or

---

3. Pearson is a significant actor in this litigation. Evaluation of his testimony is elusive. IFFA introduced his post-employment deposition and apparently relies on some of his appraising comments as admissions. He left TWA's employ some months after the Icahn takeover and seems to have had no significant role during the critical period in 1986. Differences of opinion and judgment within TWA's management are obvious, and Pearson now has at least a psychological incentive to defend the comparatively generous position of TWA negotiators in early 1985. TWA questions his experience in flight attendant work rule issues. While there is no reason to doubt the general credibility of his testimony, some self-serving emotional bias doubtless affects his commentary during the deposition testimony. Comments during his tenure with TWA in private discussions with IFFA representatives should also be somewhat discounted in that there was apparent role-playing between Hoar as the hard-liner and Pearson as a moderator. Pearson's general moderation in 1985 seems to have had some influence in causing IFFA to miscalculate TWA's "bottom line" demand in 1986.

primarily concerned in late May 1985 with obtaining information. There is no specific evidence that IFFA had been communicating with Meyer or Pearson or the mediator to make good on earlier pledges that Hoar would provide requested information. At least one major motivation for the blanket request seems to have been the creation of a record for possible litigation (if the release was not timely granted) or exertion of some pressures or legal worries during a countdown. This finding does not deal with the legitimacy of the various requests, but has a bearing on the issue of causation of the March 1986 strike.

In May 1985 United Airlines pilots struck. In the same month, Carl Icahn made a bid for TWA. Apparently recognizing that those events rendered a release inadvisable, the NMB merely recessed talks. Talks were not resumed until December. One of the three best prospects for settlement was thereby missed.[4]

B. The next period of negotiations began with conferences with Carl Icahn, a private individual, for whose conduct from June through September 1985, TWA is not legally responsible. The course of negotiations is important, however, in appraising the renewed sessions with TWA officials in December 1985 and thereafter, after Icahn became the controlling stockholder in TWA.

Takeover attempts began in May 1985. Separate attempts were made by Icahn and Frank Lorenzo of Texas Air, whose takeover of Continental Airlines and subsequent avoidance of collective bargaining agreements through use of the bankruptcy laws had made him notorious with airline unions. After some false starts, the three major unions, ALPA, IAM and IFFA, began to deal with Icahn as a prospective "white knight." At a meeting in June, Icahn told the unions that he needed a 20% reduction in labor costs, then considered to be approaching $1.5 billion, in order to attract lenders needed for his acquisition of stock; he also urged a speedy resolution (apparently so that his plans would not be endangered by stock market fluctuations). Icahn asked a 20% reduction from each of the unions. While initially speaking of labor costs comprehensively, to achieve a saving of $300 million, he clarified his request to concessions in wages and benefits, saying he did not understand work rules and productivity issues.

ALPA, representing pilots, agreed immediately, and was later persuaded to accept a 26% reduction. The average pilot wages amounted to $90,000. The wage sacrifice by pilots would thus have averaged some $23,000. In order to obtain ALPA agreement, Icahn agreed contractually to use his "best efforts" to obtain 20–22% concessions from others.

IAM was initially opposed to any concessions, but after negotiations with IAM representative Peterpaul, Icahn came to believe on Friday, August 2, 1985, that he could reach agreement on a 15% concession that weekend. IFFA negotiations were scheduled to occur last. Icahn called Frankovich on August 2, however, and urged that she remain available for weekend negotiations that he hoped would complete contract commitments from the three unions and permit him to move immediately to complete stock purchases assuring him of control of TWA.

Frankovich had remained in New York on several occasions in July without being invited into negotiations (except for one evening session of informal visiting which she declined because she would be "outnumbered"). She was scheduled to be hostess at a class reunion party in California on Saturday night, the 3rd, but told Icahn she or other IFFA representatives could be available during the weekend. The matter was not thereafter pursued by either party. A meeting later Friday with Icahn was scheduled, and held; this was the first individual bargaining meeting between Icahn and IFFA representatives.

Icahn asked IFFA to agree to the 20% reduction previously sought; IFFA insisted it would not go beyond the 15% that Icahn expected from IAM. Arguments turned

---

**4.** As will appear, in retrospect the other opportunities were in August 1985 (negotiations with Icahn) and December 1985 (using Pearson's remaining influence).

bitter over the question whether IFFA was entitled to parity with IAM. Generally accepting for this ruling the firm trial testimony of Frankovich, insofar as it departs from the deposition testimony of Icahn, which seems somewhat unsure as to exact dates and statements, and at one point in phrasing seems calculated, Icahn made various arguments: (1) the mechanics were a "skilled work force"; (2) the mechanics' pay was "competitive with the industry"; (3) IFFA had enjoyed disparate increases, as compared with IAM; (4) Frankovich was "missing the point" in that Icahn was talking about the marketplace and "I can get people to do your job for a lot less than you want ... See that girl on the street out there? That is a stewardess"; (5) responding to Frankovich's statement that janitors were in the IAM bargaining unit, "A janitor is a breadwinner [who] probably has got a family at home to support [while] you girls are second incomes and you don't need the money"; and (6) after vehement argument, "Well, what are you to do about it? Are you going to blow up the airplanes? Are you going to burn down the airline?" Tr. 3943–8.

Accepting for this motion the essential soundness of the Frankovich testimony, it is concluded that Icahn's basic points were that "the marketplace" put flight attendants in a weak position because they could be replaced inexpensively and he did not believe the flight attendants were capable of stopping airline operations and thereby imposing noncompetitive salaries. In discussing the legal issues additional factual observations will be made but it is concluded that points (4) and (6) were reasons or suppositions that would be and were controlling in conventional economic terms. The rhetoric that miscarried was a clumsy effort to persuade that degenerated into wise-cracks.

A calculating businessman is quite unlikely to adjust middle income wages to the "needs" of his workers, although he may try to persuade them to accept his proposals by contending they do not need any more than is proposed. Icahn's subsequent inquiries and comments about the "breadwinner" issue during the months ahead simply show he was brooding over the debating point that boomeranged. When his terminology became controversial, weeks and months before the strike, he was well aware that many or most flight attendants were primary breadwinners.

An agreement with IAM was completed over the weekend and Icahn bought stock on Monday, in reliance on the two agreements. This is a further indication that Icahn concluded he could afford to gamble with IFFA but that the pilots and mechanics were necessary to his prospects. On Tuesday he met with Frankovich and again was unable to reach agreement although they were tantalizingly close. Frankovich offered a 17% concession at a time when Icahn was still willing to agree on 20%, and Icahn testified credibly that he thought perhaps on Sunday IAM might have agreed to 17%, thus making the IFFA offer compatible with his perceived needs that day. In light of the pilots' offer of 26%, he could afford to yield 3% to both IAM and IFFA and still achieve his goal. It is speculative, however, what would have occurred if there had been joint or concurrent sessions on Sunday, just as it is speculative (looking forward to December) whether Pearson could have struck a bargain at 20%, despite reluctance at that time by Icahn, if such a proposal had been pushed by IFFA.

After Icahn's stock ownership gave him effective control over labor contracts, he learned that TWA still had a pending proposal for work rules changes but a pay pause. This being inconsistent with his individual bargaining, he directed that the pending proposal be withdrawn, as it was in October, and that a new proposal be made which would contain both a reduction in wages and work rules changes. The new proposal, made in December, effectively restarted negotiations by demanding concessions that more than doubled the demands made by Icahn in June and by TWA in May.

My best appraisal of the causes of the major increase in TWA demands from IFFA would be (1) a personality and experience difference tending to produce bold, nearly reckless moves by Icahn and more

moderate, accommodating and conventional proposals by Pearson, (2) sharply adverse business conditions at TWA, personally felt by Icahn in his financing opportunities, which allowed him to assert material adverse changes to renegotiate his purchase offer to minority stockholders and probably caused new concerns about TWA's future and the value of his investment; and (3) awareness that IFFA had become contractually isolated from potential allies and was perceived to have little economic clout. The more diabolical alternatives of Icahn's sexist bias or his desire for a confrontation and strike seem quite unlikely, as a matter of common experience and in the factual context discussed here and subsequently.

According to Icahn deposition testimony, designated and not contradicted (pp. 262-3), "the projections were coming in way, way off what we thought and we weren't able to raise the money through Paine Webber. Everything that hit the industry was hitting it. I was looking at the numbers and saying, my God, I should have asked for a lot more from the pilots and IAM, but I had deals with them ... When I got into the company we had the bombing at the airport, the fare wars were going on, the projections were coming in eight or ten times over. The loss was eight or ten times over what we thought it was going to be." Projections for the fourth quarter loss in 1985 increased from $12 million to $120 million. Dep. pp. 222-3, 262. The anticipated profit for the year ($50 million —Exh. 22, p. 060477) had turned into a loss expected to exceed $125 million. A later calculation of the 1985 loss was $193 million. Exh. 288. Cash reserves fell from $400 million in April 1985 to $50 million by December. While many of the losses were not likely to recur in 1986 and later years, terrorism and fare wars could easily be recurring problems. Presumably without taking into account such unpredictable factors, a 1986 profit of $225 million was forecast. This assumed $200 million in increased revenues.

While TWA had traditionally compared itself with certain major airlines (Pan Am, Northwest, Eastern, United—Pearson Depo. 126), Continental and People Express were becoming formidable competition for TWA. Tr. 2226, 1646-7. There is no reason to believe that Icahn expected that high cost, high fare routes would be safe from low cost discounters, or that he desired to keep TWA in its traditional mode.

The December 2, 1985, comprehensive proposal by TWA (Exh. 48) sought a 22% reduction in pay, major changes in work rules and other cost-reduction items. Most of the work rule proposals of February 1984 were reintroduced, but there were some modifications, including several IFFA proposals. Hoar valued the changes at $88 million annually; Icahn made an estimate of $110 million. TWA told the negotiators that Icahn had achieved $200–220 million out of a $300 million objective in reduced labor costs from all sources. Exh. 22, pp. 060478-9. That calculation would require picking up an additional $80–100 million from IFFA. TWA internal documents generally show comparable valuations. *See* Exh. 529, with a few different estimated values, proposing $90 million in flight attendant savings, and Exh. FFF, the apparent source of the negotiation estimates. Frankovich in a February pre-strike "road show" presentation, said it is "pretty obvious" where the differences yielding $110 million come from, correctly noting that a crew complement proposal was not given a bargaining table value by TWA. Exh. 512, p. 5. Her trial testimony suggested that Icahn may have treated the unvalued B-scale provision as a source of predictable savings.

Hoar supplied a breakdown per item of the company proposal. Exh. 22, pp. 060495-6. He failed to mention two overtime savings estimates on Flex Cap and Bidding; adding the disclosed items together would show omissions and apparent error in that the totals would not reach $88 million otherwise. IFFA was aware that significant overtime savings were anticipated from the two proposals in question. Tr. 3658-9.

Frankovich also told flight attendants that there was more than the disclosed $80,000 saving in having them "doing ticket agent job in terminal." Exh. 512, p. 5.

Exh. 529, an internal document, does show a saving of $2.5 million for ticket lift. Another internal document (Exh. FFF) estimates only $80,000, however. TWA official Borden testified that the larger sum did not represent a saving, but an avoidance of additional cost of hiring more passenger agents. Borden Depo., pp. 161–2. While it might be expected that TWA would give some credit for additional flight attendant work likely to avoid some future expenses, it would not misrepresent the facts to say that TWA did not expect the proposal to reduce *current* costs. This was similar to the TWA handling of B-scale salaries for new hires, potentially probably a more significant matter.

The saving on TWA's proposal to move flight attendants to less valuable rest seats, was variously estimated at $1 million and $3.5 million in internal documents. Exhs. FFF, 529. While it might be supposed that TWA could have made more accurate and consistent estimates, such a conclusion is a supposition only and pretrial discovery has not established lack of good faith in making these estimates. It is apparent from inconsistencies in TWA's own internal figures that placing dollar values on predictions is an inexact science, as those who follow Federal deficit predictions should already be aware.

From early December until March, after release of the parties from formal bargaining, there was no dramatic change in bargaining positions of either side. Most of the significant activity was in private sessions. Frankovich did not appear at the bargaining table during this period, but was engaged in several private discussions with Pearson and Icahn and, in February, in addressing flight attendants to rally them for an anticipated strike.

IFFA's posture with its members and at the bargaining table was to show "anger and determination ... STEADFAST RESISTANCE." Its spokesperson at the ta-

ble did acknowledge that "IFFA recognizes TWA's difficulties. We see satellites as a significant area where you can be helped." Exh. 22, p. 060500. At a later date it was estimated by IFFA that a satellite program would be worth $4–5 million. Exh. 22, p. 060553, Tr. 2046. IFFA's commissioned study of satellites (accommodations to residential disbursement of crew members) had already shown they would provide little economic relief to TWA. Exhs. WW, XX. Hoar's conduct at the bargaining table was at least equally unhelpful, and apparently often abrasive.

Frankovich and attorney Jolley met with Pearson, still TWA's president, in December, before and after meeting with Icahn. Pearson suggested that IFFA would have to grant TWA concessions of at least 20% in order to obtain an agreement. Frankovich expressed interest in that figure (3% more than her highest offer to Icahn in August), and Pearson may have said he had "half a mind" to see what he could do with the TWA board of directors. Vol. II, Pearson Depo., p. 37. Neither side made a definite offer, and Pearson implicitly acknowledged he might not be able to persuade Icahn or a majority of the Board that such a settlement should occur. He told the IFFA representatives that he had a "limited life expectancy" with TWA. Neither party pursued the concept. It is unclear whether the discussion related to a percentage of wages or total costs.

After a preliminary meeting in January between Jolley and Hoar at which it appeared that the parties were very far apart,[5] Frankovich and Icahn met under the auspices of the NMB on January 22 and 23, 1986, at a time when the NMB was considering releasing the parties for self-help. IFFA made another proposal for a temporary 15% reduction in wages and a B-scale (new hire) proposal somewhat above the rate TWA proposed to use.[6]

---

5. Hoar confirmed his pessimism in an internal note dated February 10, 1986, stating he had agreed to a bargaining committee meeting "for political/legal reasons" but that "it is too early in the cooling off period" to have "high expectations." The letter does implicitly indicate some

hope for a settlement later in the countdown. Exh. 292.

6. It may be noted, however, that although the "average head cost" of experienced flight attendants was calculated at $41,785 annually (Exh.

This was rejected by TWA, and the NMB notified the parties on February 4, 1986, of their release from formal bargaining, thus beginning a 30–day countdown before self-help would be authorized. Exh. 151.

By letter dated January 30, 1986, IFFA asserted that it had received inadequate information from TWA in negotiations on December 4, 1985, almost eight weeks earlier, and requested data on the flight attendant, mechanic and pilot work forces, concessions made by the IAM and ALPA, and detailed cost information on each TWA proposal, separately presented by subpart. It also asked for an explanation of all calculations made in valuing the proposed savings. Exh. 50. A preliminary response was made by TWA on February 4. Exh. 151. Further responses were made at a meeting on February 13. Exh. 22, pp. 060523–7. An additional written response was made on February 24, 1986. Exh. 140.

TWA declined at that time to supply information about other work groups. This was unreasonable, as the parties had continuously discussed issues relating to other work groups, either as an accommodation or to advance some argument. While no such argument is controlling, some are of considerable significance; for example, TWA's trial contention that it was generally seeking work rules no more onerous than had been agreed to by the pilots, the other members of a flight crew.[7]

Basic financial estimates regarding the TWA proposals have generally been supplied. To the extent details, calculations and breakdowns on the proposals and counterproposals were available and were not supplied, such materials and theories have been explored after filing of litigation in March 1986. Such information has led to some further quarrels between the parties, but their potential for shaping an agreement between the parties has not been demonstrated or asserted by IFFA, except in the abstract.

Hoar testified in designated portions of his deposition that Jolley told him, in their meeting in January 1986, not to be "concerned about the numbers." Hoar Depo., pp. 611, 615–6. Apparently Jolley was referring to the details, not the general parameters of an agreement. While Jolley had no known authority to waive IFFA demands for information, the testimony tends to confirm that the issue of missing information was not the real impediment to agreement.

While Frankovich was aware, from the Jolley memorandum, that a claim of denial of information could lead to litigation, and would thus be helpful to IFFA, and she referred to such denial in her February 1986 "road show" presentation (Exh. 512, p. 1), the reference was confined to the first period of negotiations ending in May of 1985 and not to the period after valuations were given for the December 1985 proposals. The 15 page outline of her presentation contains a considerable array of knowledge and contentions about the pertinent numbers, as of February 1986.

A mediator designated by the NMB attended almost every bargaining session where requests for information were made. A primary function of a mediator in assisting parties to reach agreement would normally be to obtain appropriate information that may lead to agreements. Tr. 4378. Unless TWA simply did not wish to reach an agreement (a matter considered below) and thus rejected appeals from the mediator in the confidential sessions, any failure to supply information would indicate (1) nonexistence of hard figures or (2) lack of insistence from the mediator, on the theory that the parties were too far apart in their

---

529) IFFA had no serious quarrel with a B-scale for new hires at about $1,000 per month. Exh. 49, p. 3. Frankovich recognized that figure as the market rate at which people could be hired. Tr. 4634. The starting monthly salary under a 1985 Pan Am contract was $784. Exh. Z, p. 18.

7. There is no reason to believe, however, that IFFA lacked access to ALPA agreements or could not learn from pilots the work rules under which they operated and the success of such operations. Frankovich viewed such an argument as degrading to flight attendants, because of other pilot benefits, but stated that at one time IFFA did not resist arguments for conforming to the pilots' work rules. Tr. 5198.

concepts to make economic details meaningful.[8]

Trial testimony confirms that no informational disclosures obtained through discovery could have materially affected the negotiations, if known earlier. There was no convincing response to questions from the bench seeking identification of problem areas where more information could have broken the deadlock. *See, e.g.,* Tr. 4458 et seq., 4758–9. A list of TWA priorities, for example, seems not to have existed. Dollar values assigned by TWA would show how concessions tempting to TWA might be structured. No information sought from TWA could likely result in flight attendants accepting the work rules concessions that would have filled the chasm between TWA's evaluation of IFFA's best offer on March 6, and the minimum sought by Icahn. No financial information or calculations could have persuaded the flight attendants to increase their offer by $20, $30 or $40 million. Tr. 4338–40.

One of the matters that aggravated relations between the parties in February 1986 was a statement in a widely publicized letter to employees signed by both Icahn and Pearson asserting that flight attendants had received grossly disproportionate increases from 1981–1986 (40.1% for IFFA as against 11.6% for IAM). Exh. 279–A. This serious miscalculation was privately acknowledged (Exh. 140 and 302), but there was no public retraction. This blunder permitted Frankovich to call TWA's "lie" (Exh. 512, p. 10) and to assert at IFFA rallies, "you know both the IAM and IFFA got the same increases in the last negotiations." Icahn was depicted in an IFFA pamphlet with a Pinocchio nose. Apparently TWA could, in good faith, have used the Meyer material, covering a longer period,

or referred to its earlier publication (Exh. 69), to contend without denial that IFFA had indeed obtained increases exceeding IAM's rising costs by some 50%, albeit IFFA was then coming up from a lower base.

There is an inherent tension between the two major IFFA theories, lack of information (including misinformation) and excessiveness of TWA's demands. If TWA simply wanted too much, the details of what it wanted would not have much significance. The trial testimony comes considerably closer to establishing the assertion of excessive demands than the theory that failure to supply information possessed by TWA was a cause of the ultimate impasse. One of the credibility strengths of the Frankovich testimony, for example, was her method of resolving this tension. In tonality throughout, and also in words, she spoke much more forcefully in charging excessive demands rather than lack of information as the ultimate cause of the strike. Tr. 4514.

The various claims of misconduct in bargaining by TWA prior to the strike, apart from the issue of excessive demands, may, for purposes of ruling TWA's motion, be generally accepted; they fall short, however, of even plausibly being a cause of the impasse. Even assuming there were numerous instances of bullying and occasional devious behavior by TWA bargainers and supporting staff, such misconduct would have been directed toward tricking or coercing IFFA into making a bad bargain. It must be emphasized, in fairness, that the court has not heard a developed defense by TWA and any impressions would necessarily be formed from hearing only part of the story. But taking matters at their worst, IFFA was not in fact

8. On March 1, 1986, the mediator stated that "The Co. has provided answers (numbers) to Union Qs. I suggest any outstanding/follow-up Qs be dealt with now. Does the Union have Qs." Frankovich responded that she would like to "start at the beginning." The mediator urged her to "keep to the substantial ones." Exh. 22, p. 060534. After an hour's recess, IFFA listed and the parties summarily discussed 21 topics. *Ibid.,* pp. 060534–44. After a brief meeting with the parties the mediator simply asked for new proposals. *Ibid.,* p. 060545. While a review of the discussion does not show it to be a model of good bargaining it is quite unlikely that substantial follow-up questions that could make or break the success of negotiations would have been allowed, either by the mediator or IFFA, to drift unanswered into the final hours of the countdown. It is further noted that there is no record of post-strike requests for financial information in bargaining sessions, and no such requests have been made to the court.

trapped or pushed into making a bad bargain, and did not strike because of frustration at the bargaining table. It plainly appears from the record that the sole cause of the impasse was the wide divergence between the demands of TWA (Icahn) and the more modest concessions proposed by IFFA. This being the case, the basic factual issues are whether TWA's ultimate demands have been shown to be beyond the range of reasonableness and/or designed to force a strike rather than to reach agreement.

Again it seems unprofitable to detail each move in the final days of the countdown. Icahn concluded that IFFA had moved toward his objectives only marginally, and Bryner, upon whom he was relying for details in the final hours of negotiations, placed a value of $39 or $40 million on IFFA's best offer. Bryner Depo., p. 71. This was some $33 million less than Bryner's understanding of Icahn's bottom line demand. Bryner Depo., p. 74. Icahn's estimate of the gap was from "about $50 million," his recollection of his valuation of IFFA's best offer, and "maybe even $78 million," his estimate of what it would take for a settlement. Icahn Depo., pp. 360, 365. Thus Icahn thought the parties would have been at least $28 million apart, if he had reached his minimum figure. Hoar said the gap in actual negotiations was $40 million. Tr. 4058.

The principal move on the last day of negotiation was Icahn's. He stated willingness to reduce the pay concession by 5%, to 17% (the figure Frankovich had reached in August), to drop a demand to eliminate company payments to union representatives, and he made a general proposal, in exchange for Flex Cap, that "we won't slash anyone." Tr. 2078–9, 4030. Frankovich has the most detailed version of discussions on the latter point, and recollects that she asked if Icahn was proposing a no-furlough agreement, to which he replied, "not the kind you mean." Tr. 4030–1. TWA contends that if Frankovich is believed the reference by Icahn would have been to IFFA's "scope" proposal, which contained the most current "job security" reference, but also other provisions. Exh.

49 at 4. IFFA contends Icahn did not mean a "no furlough" provision, such as it proposed later in the day. But rejection of the later package does not show disagreement with some variety of "no furlough" provision in exchange for agreement on Flex Cap. The parties did not pursue the matter. While it cannot be concluded that Icahn casually made a "priceless" proposal, as TWA contends, it will not be inferred that the statement lacked substance.

It cannot be concluded that TWA's bargaining demands were so grossly excessive that they exceeded the wide range of reasonableness, unless, as will be discussed in the legal portion of the brief, unlikelihood of IFFA's acceptance means that TWA was legally obligated to trim its demand. While the wage concession sought on March 6 was several points more than IAM had yielded, the reasons for this differential have been discussed. Disregarding Icahn's rhetorical flourishes on August 2, he had a right to believe and apparently did believe that the marketplace would supply substitutes for IFFA members at much less cost, that IFFA did not have the power to force noncompetitive wages on TWA, and that IFFA compensation increases had considerably outstripped those of a stronger union, IAM (at least during the period referred to in the Meyer presentation).

The IFFA members have a right to pride in their long service to TWA and their professionalism, which is probably not appreciated by the public. They view their responsibilities for passenger safety as their prime function. This mandates their presence on the aircraft and allows them to perform incidental duties that are more familiar to passengers. Tr. 4411. It was within the range of reason, however, for TWA and particularly Icahn to consider an average head cost of $41,785 as considerably beyond the marketplace value of their services, when viewed in economic terms of the cost of an adequately trained substitute. Considering the hazards of the deregulated industry and of international travel on which TWA's success was dependent, it was reasonable for TWA in purely economic terms to exercise hard

bargaining to achieve major payroll savings and to demand from IFFA, the most feasible available source, a productivity cushion for possible economic turbulence ahead.

The work rules or "lifestyle" changes seem most naturally comparable to the other members of the flight crew, the pilots. IFFA has not demonstrated that TWA was seeking from flight attendants generally more rigorous time commitments than were made by pilots. If it would be considered "degrading" to conform to pilot work rules (Tr. 5198), such rules must be deemed by IFFA to be *more* demanding. Of course pilots receive much higher pay and perhaps benefits (Bryner Depo. at 380), presumably attributable to higher skills and responsibilities. Nothing presented, however, tends to show flight attendant entitlement to a less demanding or different lifestyle. TWA has made some showing, by contrast, that items 2 through 11 on the TWA list of demands (Exh. FFF, 529) were generally comparable to what ALPA had agreed to. Exh. 502. While IFFA disclaims the comparisons it does not show flaws in Bryner's analysis or conclusions. Depo. pp. 374–9, Exh. O. IFFA fails to show that what TWA sought was unreasonable (and arguably sexist) in that it would impose on flight attendants time and scheduling responsibilities more onerous than the lifestyle obligations of pilots.

The total of the wage concessions ultimately sought in bargaining and the work rule demands listed in items 2 through 11 is approximately $69 million. Without reviewing the intrinsic reasonableness of other requested concessions in specifics, this roughly indicates that the range of reasonableness in making proposals is sufficiently broad to include what Icahn was seeking.

The court does not mean to suggest that it would have prescribed, in interest arbitration, anything like the TWA minimum demand, nor does it suggest that IFFA's position was unreasonable. It is inappropriate to take sides on that question since it is unnecessary to a decision. I do emphasize the very wide range that the concept of reasonableness encompasses, and must encompass if courts and administrative agencies are not to be the regulators of wages and working conditions.

The remaining fact issue for the pre-strike period is whether TWA was engaged in sham or surface bargaining, concealing an intent or wish not to reach agreement. The evidence is clearly to the contrary, apart from the legal issue of whether failure to withdraw allegedly harsh demands, individually or collectively, because there is a likelihood of a strike, can be treated as unlawful bargaining conduct.

While Hoar's behavior at the bargaining table was occasionally arrogant, this is consistent with putting on a convincing show of a proper intent to insist upon much more dramatic concessions than IFFA was proposing. There is no evidence that Hoar sought to place TWA in the risky and inevitably burdensome financial position that a strike would create. In any event, he was an agent for others.

It is not contended that Pearson or Meyer was seeking a strike or was insistent on managerial dictation of terms as a matter of principle or antiunion animus. On the contrary, Pearson was notably well-disposed towards IFFA and there was a tradition of dealing with unions.

The evidence presented does not permit a conclusion that Icahn sought a strike or was unwilling to negotiate. While his techniques may not have been those of an experienced labor negotiator, his entry on the scene led to agreements with ALPA and the IAM in record time, at least in Railway Labor Act terms. He used every argument he could think of (including a few that were inappropriate) in seeking agreement with IFFA in August 1985. TWA's greatly increased bargaining demands in December and thereafter do not, as is often the case, evidence sham bargaining. There were changed conditions from both the spring and the summer months, and Icahn was simply a different person from those earlier in charge. If a union election occurs during bargaining, and more militant officers are elected, a drastic change in bargaining positions would be

anticipated, without evidencing any bad faith in bargaining.

Neither IFFA nor TWA showed much flexibility from December until the strike, in the sense that neither side moved into the range of a probable settlement. Taking a "hard line" is, however, quite consistent with a desire to reach agreement. A tendency to yield may weaken credibility and start a pattern of continuous retreat. Hoar's note in February indicates an expectation of last minute movement, which did occur, although not nearly enough to bring agreement.

Icahn's reluctance to attend the final sessions is not revealing. He had become an object of antagonism and would apparently have preferred to leave Hoar at the table, a common technique. His behavior on March 6 shows an intense desire for agreement, although one very close to his reduced terms. The IFFA bargaining committee recognized that he became "crazy ... very excited." Tr. 3555–6. He appealed to IFFA representatives not to take their members "over the cliff." He warned of great danger. His deposition credibly expresses considerable alarm at the possibility of strike losses and his concern that the IAM might support IFFA. He accurately characterizes his plea to IFFA as "impassioned." Icahn Depo., pp. 371–2, 397–8. As the IFFA representatives left the room on March 6, he said "there goes $50 million or $60 million" (Tr. 3513), apparently referring to strike losses as a waste of money. While the strike may ultimately have been beneficial to TWA, outweighing strike losses (at least if TWA prevails in this and possibly other litigation), plaintiff's proof falls considerably short of supporting a conclusion that Icahn planned it that way, hoped for such a result or happily saw his hopes realized on March 6 and 7, 1986.

C. After the "cooling off" period expired on March 6, 1986, TWA implemented virtually all, or a vast majority, of its demands (going back to a 22% wage cut, for example) and IFFA struck.[9]

IFFA has contended that TWA's post-strike conduct prolonged the strike, and thereby converted the strike into an "unfair labor practice strike," if it could not initially be so characterized. Responding to an inquiry from the court at oral argument, IFFA does not suggest any date for any unlawful event that so antagonized the strikers as to convert what was hypothetically an economic strike into a more protected strike. Doc. 244, pp. 1, 8–9. This confirms the court's conclusion that the evidence does not show striker reaction to any post-strike event that caused the strike to become prolonged. The strike ended in mid-May 1986, and was not prolonged by the conduct now complained of. That conduct is summarized, however, insofar as it may have a bearing on the question of TWA's prior good faith in bargaining.

There is evidence that flight attendants on sick leave when the strike began were treated as strikers. In some instances such persons could not fairly be so characterized, for example, if an illness or other incapacity that began on or before March 6 continued unabated into mid-May. TWA contends there was such a high level of sick leave claims that it could be reasonably inferred there were strikers asserting sick leave for protection. There is an IFFA contention, however, that the decision was made as early as February 28, 1986 (Doc. 219, p. 155). It may be that TWA made a serious mistake of fact or law in many individual cases. Any such violation of individual rights can be remedied, to the extent remedies have not already occurred (Exh. 406), and the conduct in question sheds no material light on the claim of bad faith bargaining or prolongation of the strike.

TWA took several actions based on the belief that the entire 1983 contract was at an end. It stopped complying with the union security clause. It stopped contribu-

9. The ability to implement work rules changes tends to show their feasibility (which IFFA challenged) and lays to rest any doubt that TWA really sought the changes (and was not just making demands to force confrontation). IFFA does not develop any contention that the limited number of unimplemented demands were demonstrably lacking in feasibility or otherwise known to be unsound when made.

ting to insurance premiums although it apparently gave IFFA and the individuals an opportunity to pay such premiums. After the strike ended, and before this court ruled in August 1986 that portions of the contract remained in effect, further instances of self-help, inconsistent with the Red Book, occurred. As this court's ruling in August acknowledged, however, an appellate case that seemed most directly in point lent support to the view that Red Book obligations (and in particular a union security clause) did not survive into the self-help period. *See TWA v. IFFA, supra,* cited in n. 1. The question has caused an even division in the United States Supreme Court. Although it can now be said that TWA was legally in error, this would not suggest that the actions were not taken in good faith reliance on legal advice and would thus have no bearing on determining whether the earlier bargaining had been conducted in good faith.

In negotiations to end the strike and in post-strike negotiations, TWA made additional demands. As economic power grows it is normal for a party to seek to use it and to seek reparation for damages. No adverse inference will be drawn from post-strike heightening of TWA's demands. If the matter has significance, it can as easily be argued that it tends to show that TWA withheld some "wish list" matters in its pre-strike demands, thereby strengthening the TWA contention that its earlier demands were reasonable and not designed to force a confrontation. On balance, the matter will be disregarded.

## II. LEGAL ISSUES

### A. General Statement

Collective bargaining obligations under the Railway Labor Act (45 U.S.C. § 152, First) and the National Labor Relations Act have been treated as somewhat parallel, despite minor differences in the statutory language, at least since *NLRB v. American National Ins. Co.,* 343 U.S. 395, 402 n. 8, 408, 72 S.Ct. 824, 828 n. 8, 831, 96 L.Ed. 1027 (1952). The Supreme Court in *Chicago & N.W. Rwy. Co. v. United Transportation Union,* 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971) (*C & NW*), recognized non-statutory, judicial remedies for violation of the bargaining duty to "exert every reasonable effort to make ... agreements."

The case which opens the courthouse doors here, *Chicago & N.W. Ry.,* 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187, held that a railroad company might seek to enjoin a strike, even after release of the parties by the National Mediation Board, on an allegation that the union had violated its statutory obligation to bargain on the issue in question. The courts were thus brought into the bargaining process, but with strict caveats by the majority and a strong dissent by Justice Brennan.

Four members of the Court, in a dissenting opinion by Justice Brennan, were of the view that the Railway Labor Act "excludes any role for the judiciary to oversee the relative efforts of the parties in their mutual attempt to reach settlement." 402 U.S. at 599, 91 S.Ct. at 1746. Five members, in an opinion by Justice Harlan, concluded there was a judicial role beyond simply ordering the parties "to recognize one another and sit down to bargain" (the Brennan characterization of the duty) and that the courts have a duty, on complaint, to determine at least if there has been bad faith in negotiations. 402 U.S. at 578–9, 91 S.Ct. at 1736. The majority volunteered, however, "two caveats." 402 U.S. at 579, n. 11, 91 S.Ct. at 1736 n. 11. "First, parallels between the duty to bargain in good faith and the duty to exert every reasonable effort, like all parallels between the NLRA and the Railway Labor Act, should be drawn with the utmost care and with full awareness of the differences between the statutory schemes ... Second, great circumspection should be used in going beyond cases involving 'desire not to reach an agreement,' for doing so risks infringement on the strong federal labor policy against governmental interference with the substantive terms of collective bargaining agreements." The majority joined the minority in counseling judicial "restraint in the issuance of strike injunctions based on violations of Sec. 2 First." 402 U.S. at 583,

91 S.Ct. at 1738. There should be no "free-wheeling judicial interference in labor relations of the sort that called forth the Norris–LaGuardia Act ..." *Id.* The majority further noted that Congress had amended the NLRA when it perceived that "the NLRB had intruded too deeply into the collective-bargaining process under the guise of enforcing the duty to bargain in good faith." *Id.*, n. 19, 91 S.Ct. 1738 n. 19.

The lesson of *C & NW* has been well learned or anticipated, and judicial restraint has been sufficiently exercised to avoid further Congressional action. Never before this case has a court been asked to examine, at the behest of a union, a scenario of bargaining sessions, for the purpose of finding an employer violation of the bargaining law and imposing on the employer the severe sanctions rather frequently applicable to an "unfair labor practice strike" under the NLRA. There have been a limited number of cases, however, in which employers charged unions with making excessive demands at the bargaining table. In all such cases, the courts have rejected the invitation to declare demands excessive. *Trans International Airlines, Inc. v. Intern. Bhd. of Teamsters*, 650 F.2d 949, 958–9 (9th Cir.1980) (Kennedy, J., affirming a decision by Peckham, C.J.), *cert. denied*, 449 U.S. 1110, 101 S.Ct. 919, 66 L.Ed.2d 839 (1981); *REA Express, Inc. v. Bhd. of Rwy. Clerks*, 358 F.Supp. 760, 771, 774–5 (S.D.N.Y.1973); *Atlantic Coast Line R.R. v. Bhd. of Rwy. Trainmen*, 262 F.Supp. 177, 183–5 (D.D.C.1967), *rev'd. on other grounds*, 383 F.2d 225, *cert. den.*, 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968). *See also Rwy. Labor Exec. Ass'n. v. Boston & Maine Corp.*, 664 F.Supp. 605 (D.Me.1987); *Erie Lackawanna Ry. Co. v. Lighter Captains Union*, 338 F.Supp. 955 (D.N.J.1972).

In the *TIA* case, Judge Kennedy approved a ruling that the union's increase in bargaining proposals from 61 to over 200 was a "reasonable response" to changed conditions (a merger). He quoted Judge Peckham's ruling that mere "exorbitant size" of demands does not demonstrate a refusal to make reasonable efforts to reach an agreement, further quoting the comment that " 'the court can find no previous decision under the RLA, nor can TIA suggest one, which has inferred lack of reasonable effort solely from the size of the proposals put forth by the parties.' " Two reductions in the union proposals were noted on appeal, although it was said that the union's bargaining was " 'obstinate and unyielding.' " 650 F.2d at 958. While stating the precaution that the court was not holding that allegedly excessive proposals could *never* be the basis for a finding that a party did not comply with its bargaining obligations, Judge Kennedy cited the *REA* and *Atlantic Coast Line* cases for comparison with the *TIA* ruling. 650 F.2d at 959.

In the *Atlantic Coast Line* case, Judge Holtzoff refused an injunction after a full trial, simply noting his conclusion that "the negotiations were genuine" and that "the reasonableness of a proposal contained in a Section 6 notice [and apparently insisted upon through negotiations] should not be subject to judicial review." 262 F.Supp. at 184–5. Judge Holtzoff declined to examine critically the contention that proposals "must be within a debatable range and not so extreme as necessarily to preclude favorable consideration" by the other party. *Id.* In *Rwy. Labor Exec. Ass'n., supra*, the same ruling was made last year as in *Atlantic Coast Line*, and for essentially the same reason.

In *REA Express, supra*, Judge Weinfeld observed that the cases demonstrate a primary concern under the RLA that the attitude of parties not amount to a "refusal to bargain." 358 F.Supp. at 771, n. 43. Adoption "at all times" of a " 'take it or leave it' " attitude is condemned, but this does not forbid choosing "to be adamant in its position." *Id.* at 772. The case precludes use of the courts to coerce employees to yield to employer offers that the employees deem inadequate, even though the employer may assert that a strike for the wages sought by the union may result in bankruptcy. The decision to force the railroad into bankruptcy was said to be the union's to make; "it is not management's; it is not the Court's." 358 F.Supp. at 774–5. If a union having a strategic position of power may lawfully bring an employer to

economic ruin, a similarly placed employer may presumably insist lawfully on employee conditions that the union may consider devastating.

The above cases illustrate how the courts have been giving application to the RLA bargaining requirement, as they are obligated to under *C & NW.* The precautions of *C & NW* have been honored and in particular the courts have refrained from evaluating the substantive negotiation proposals of the parties. Implicit and sometimes explicit in the cases is adherence to an admonition of Judge Bryan, given almost thirty years ago, in a decision denying a preliminary injunction against a strike by the pilots' union:

> Whether the pilots' [negotiating] position was right or wrong, wise or unwise, economically sound or unsound, are questions with which this court is not concerned. If the processes of the Railway Labor Act could not resolve these questions, this court can certainly not resolve them, nor is it its function to do so.

*American Airlines, Inc. v. ALPA,* 169 F.Supp. 777, 797 (S.D.N.Y.1958). The courts are a safeguard against "merely perfunctory" compliance with bargaining duties, and serve, with the National Mediation Board, to give assurance that there has been " 'good faith exhaustion of the possibility of agreement.' " 169 F.Supp. at 793. The ruling of Judge Bryan draws on an NLRA judicial source characterizing the requirement of good faith bargaining as "really a requirement of absence of bad faith." The question of subjective intent may be ruled from evidence presented, including any "conduct clearly showing a wish to defeat rather than to reach agreement." 169 F.Supp. at 793–5. The *C & NW* majority decision is entirely consistent with Judge Bryan's ruling, and the Supreme Court relied on the same standard, articulated by Chief Judge Magruder in the leading case of *NLRB v. Reed & Prince Mfg. Co.,* 205 F.2d 131, cert. den. 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391.[10]

Until last September, the general procedural standards for surveillance of bargaining under the RLA have been generally equated with those under the NLRA, with emphasis, however, on the precautions announced in *C & NW.* A survey of such standards is contained in Judge Lacey's ruling in *Erie Lackawanna Ry. Co. v. Lighter Captains Union,* 338 F.Supp. 955 (D.N.J.1972). That survey emphasizes then-current case law, particularly *C & NW,* for the proposition, governing that case, that courts should proceed with great caution in attempting to supervise bargaining efforts, particularly where there is an effort to interfere with self-help after exhaustion of mediation. It is worth noting, however, in light of one of IFFA's arguments, that the case quotes a decision by Judge Friendly in which the Second Circuit assumed arguendo that the Railway Labor Act imposes a somewhat greater duty to endeavor to reach agreement than does the National Labor Relations Act. *Chicago, Rock Island & Pac. R.R. Co. v. Switchmen's Union,* 292 F.2d 61, 70 (2d Cir.1961), cert. den., 370 U.S. 936, 82 S.Ct. 1578, 8 L.Ed.2d 806 (1962). That hypothetical assumption was made in the course of denying relief. It pre-dated the more cautionary language of *C & NW.* While a similar

10. As a practical matter it must be supposed that Congress could not have intended to authorize or require an in-depth review of the substantive negotiating positions of the parties or other similarly intrusive procedures to enforce the bargaining requirements of the RLA. Almost identical language, requiring exhaustion of "every reasonable effort to settle" a dispute, is contained in the Norris–LaGuardia Act as a prerequisite to injunctive relief. 29 U.S.C. § 108. The Congressional concern to avoid improvident exercise of federal judicial power in labor disputes surely was not carried to the extremes illustrated by this case, which would require litigation of 18 months or two years simply to determine whether a complainant had standing to *seek* injunctive relief. The parallel to the language used in the "clean hands" requirement is a powerful caution against engaging in the deeply probing form of litigation that IFFA advocates as necessary to a sound ruling and that may occasionally occur in the NLRA cases. A requirement of "blow-by-blow" fact-finding, as sometimes mandated in NLRA cases (*Pease Co. v. NLRB,* 666 F.2d 1044, 1046 n. 2 (6th Cir. 1981)) could easily impose pre-trial, trial and fact-finding requirements that might consume three years in a massive case like this, where there are incentives to probe every minute detail.

assumption is referred to in a district court decision subsequent to *C & NW* (*Japan Air Lines Co. v. IAM,* 389 F.Supp. 27, 34 (S.D. N.Y.1975)), the district court also concluded that the ultimate question is "whether the party charged with violation of its duty has merely gone through the motions of compliance ... without a desire to reach an agreement." It is clear from *C & NW* that the RLA is to be construed as forbidding "surface bargaining" and little, if anything, further.

A further restriction on RLA bargaining duties and judicial supervision was announced by a panel of the Ninth Circuit in September. *Pacific Fruit Express and Union Pacific Fruit Express Joint Protective Bd., Bhd. Rwy. Carmen v. Union Pacific,* 826 F.2d 920 (9th Cir.1987). *Pacific Fruit* decided that courts are not authorized to compel prearbitration fact discovery in a "minor dispute." The court's reasoning, however, is clearly applicable to the duties of parties and authority of courts in a bargaining case and the court relied for its decision on *C & NW* and other bargaining case decisions. Moreover, the NLRA duty to provide information in aid of an arbitral process parallels the duty to provide information in bargaining. *NLRB v. Acme Industrial Co.,* 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967). The Ninth Circuit rejected an analogy to NLRA duties and the enforcement thereof, saying the courts should be "wary of drawing parallels" between the procedures under the two acts. 826 F.2d at 922. The court stated that "the extensive judicial intervention that court-ordered disclosure would require is inconsistent with the history and principles of the Railway Labor Act ... Congress intended the parties to work out disputes themselves, with a minimum of judicial intervention ... Pacific Fruit's interpretation of Section 2 First would place the courts at the heart of the bargaining process whenever either side in a railway labor dispute sought information about the other. We think Congress intended otherwise." 826 F.2d at 923.

*Pacific Fruit,* if followed, would deprive the courts of duties under what this court perceived to be the major contention that IFFA relied on in filing this suit. I do not think it safe to rely on *Pacific Fruit,* however, as the sole basis for rejecting IFFA's deprivation of information claim. It may be sufficient for the Court of Appeals, but I believe alternate reasoning is appropriate. My present inclination is against following *Pacific Fruit.*

It is my understanding that TWA's experienced labor counsel shared the court's view that if IFFA concluded, during negotiations, or indeed today, that it had been deprived of relevant information having a likely impact on bargaining judicial relief could be sought. The court believed and is not inclined to retract the view that discovery during negotiations could be handled much as discovery in litigation is handled, and that liberal requirements would prevail. While not welcoming the task, it seems minimally intrusive under *C & NW.* It would be far less intrusive, for example, than post-impasse analysis which may require not only an appraisal of the right to information during bargaining but also an appraisal of the causal connection, if any, between the lack of information and the breakdown in negotiations. Ruling a discovery request also seems less intrusive than even a limited survey of negotiations to determine whether there has been good faith bargaining and what remedies should be supplied, if bad faith has resulted in an impasse and self-help. If *Pacific Fruit* is given broad application, consistent with its language, it would essentially take the courts completely out of the bargaining process, rather more in the spirit of Justice Brennan's dissent in *C & NW* than in accordance with the majority opinion. That may of course occur, given changes on the Court, but this court may not act in anticipation of an adoption of the Brennan dissent.

**B. Statute of Limitations**

Two courts of appeals have ruled that claims of bargaining violations under the Railway Labor Act become stale after six months. *Bhd. of Loco. Eng. v. A.T. & S.F. Tec. Rwy. Co.,* 768 F.2d 914, 919 (7th Cir.1985); *IAM v. Aloha Airlines,* 790 F.2d 727, 735 (9th Cir.1986), *cert. denied,* —

U.S. ——, 107 S.Ct. 400, 93 L.Ed.2d 354 (1986). Because I find the reasoning unexceptionable and given the weight of the authorities, I accept this contention of TWA's.

Occurrences before September of 1985 may well have important probative value in this case. The focus, however, should be on TWA after acquisition of ownership and control by Carl Icahn. This was well within the six month period, so the limitation period announced by the appellate courts coincides with the period of greatest importance to the determination of the cause of impasse on March 6, 1986.

### C. The Test of "Unfair Labor Practice" Causation

IFFA acknowledges that it cannot obtain relief for full term strikers in this action if they are classified as "economic strikers," that is, persons who struck TWA because (1) they were unwilling to accept lawful wages and lawful working conditions imposed by TWA when TWA became free to implement its proposals on March 7, 1986, and (2) they remained on strike until May 17 simply because they continued to resist the terms being imposed by TWA. IFFA contends, however, that the strikers were or became "unfair labor practice strikers" who should receive relief by application of principles used by the National Labor Relations Board. The NLRA distinction was adopted by the Supreme Court more than thirty years ago. *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956). For purposes of this case it will be assumed that NLRA principles should be applied to this question, although they have never been so applied in any previous litigation.

In *Mastro Plastics* the Court concluded that employees appropriately have and should be protected in the "freedom to strike against unfair labor practices" and should not be relegated to "filing charges under a procedure too slow to be effective." 350 U.S. at 286–7, 76 S.Ct. at 359–360. In a dissent based on statutory language enacted in 1947, Justice Frankfurter acknowledged that under the original Wagner Act "the results would be clear" in that

the employer violated the Act and thereby "unleashed the strike." 350 U.S. at 294, 76 S.Ct. at 363–64. This causation language depicts the distinction between an economic strike and an unfair labor practice strike.

There has been a development in Labor Board doctrine, accepted by the courts, that an unfair labor practice need only be a "factor" in triggering or prolonging a strike, and need not be shown to have been the sole cause of such triggering or prolongation. *See, e.g. NLRB v. Columbia Tribune Publishing Co.*, 495 F.2d 1384, 1392 (8th Cir.1974). In *Columbia Tribune* there was held to be an unfair labor practice strike when an employer insisted on the right to use employees from outside the bargaining unit to do the work of covered employees, and then refused to discuss wages unless the union agreed to its proposal. The refusal to discuss basic terms of a collective bargaining agreement was an unfair labor practice and a causal connection with the strike was readily established.

■ While the *Columbia Tribune* analysis is accepted, in this circuit and others, claims of alleged unfair labor practice strikers have occasionally failed when there was an insufficiency of proof that the violation in question was in fact a contributing cause of the occurrence or prolongation of a strike. *NLRB v. Proler Intern. Corp.*, 635 F.2d 351, 353–4 (5th Cir.1981); *Soule Glass and Glazing Co. v. NLRB*, 652 F.2d 1055, 1089 (1st Cir.1981) ("impermissible speculation and surmise" in finding causation). In both cases the ALJ and the NLRB were reversed, despite the usual reliance on administrative expertise. This suggests that in Labor Board practice there are occasional classifications of strikers as unfair labor practice strikers as a punitive matter, to carry out the policies of the Act, even though strictly remedial measures would be unwarranted. While this court would not quarrel with any such NLRB policy (except in some cases where the punishment may far exceed the "crime") it seems clear to me that in the RLA context there should be no such uncontrollable punitive practice but rather

firm insistence on proof of true causation (an "unleashing" effect) before what appears to be an economic strike should be reclassified as an unfair labor practice strike.[11]

### D. Particularized Issues

The unfair labor practices asserted at the beginning of this case were as follows:

1. TWA allegedly impeded bargaining by refusing to provide requested information that affected negotiations.

2. TWA allegedly dealt with a union other than the authorized representative of the flight attendants (the pilots' union, ALPA) and sought to establish flight attendant wages and related costs by agreement with that union.

3. TWA allegedly violated the Railway Labor Act by acting unilaterally in making pre-hire agreements with flight attendant trainees for the period before they became employed on the day the strike began.

4. TWA's negotiating posture, viewed in its entirety, allegedly showed bad faith, an intent not to reach an agreement, in that the employer indulged in such tactics as (a) retreating from its concessions, (b) refusing to discuss IFFA proposals, (c) demanding harsh, predictably unacceptable concessions by IFFA, and (d) insistence on concessions for sex-discriminatory reasons (that is, that flight attendants, as contrasted with machinists, were generally not "breadwinners" and had less need for the money).[12]

Additional evidence of bad faith and illegality subsequent to the beginning of the strike is offered for determination of motive and also to prove prolongation of the strike by unfair labor practices. This includes such things as (a) altering adversely work rules that were never in negotiation on the unsound theory that the contract had fully terminated, (b) further stiffening of demands, (c) obstructing union representatives' attempts to perform normal union duties, and (d) an abortive pass at interference in the reelection of the union president. Most of the events referred to occurred after the strike ended, and proof on the last two points is too petty for elaboration.

Still another belated contention is that TWA unlawfully bargained to impasse on a nonmandatory subject of bargaining; i.e., the seniority rights of former flight attendants later serving in supervisory positions who are thereafter demoted back to bargaining unit work.

Before reviewing the dispositive legal issues, a general comment on the credibility of the witnesses may be appropriate. Although ruling against IFFA, I find little to fault in the quality of the live testimony. The three principal witnesses, members of the IFFA bargaining committee, were knowledgeable about the intricacies of airline operation as it relates to the work of flight attendants, and seemed generally credible and candid. They are, however, strong partisans and heavily motivated to-

---

11. I do not believe that violations of the RLA should go unpunished, assuming the court has authority to impose sanctions. Where information relevant to bargaining is sought and has been erroneously or willfully denied by an employer, but no causal connection with a strike has been demonstrated beyond speculation and surmise, awarding to unions the expenses of obtaining judicial relief and perhaps punitive sums as sanctions may well be appropriate. Such a proposal may be deemed by some to be "freewheeling judicial interference in labor relations" condemned by the majority in C & NW. The Court did, however, delegate responsibility to the district courts to oversee "by appropriate judicial means" the enforcement of the requirements of the Act. Similarly, it is possible that monetary sanctions running to the union should be authorized, in addition to simply compensating any individuals improperly denied sick

leave benefits (under the doctrine of NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967)). It is noted, however, that the author of C & NW, Justice Harlan, in a dissenting opinion would have directed the employees to assert simple breach of contract claims—in this context, creating a "minor dispute" for disposition in arbitration.

12. Claims of age discrimination have also been referred to in the evidence. These relate to alleged references by Carl Icahn to the attractiveness of his proposals to "19 year olds." Discrimination complaints are being processed administratively. In the absence of either pleading or pretrial arguments relying on the age discrimination contention, I consider it inappropriate to make a ruling.

ward helping the full-term strikers win reinstatement. Memory tends to be self-serving in such cases. This doubtless flavors their testimony, but none of the principal witnesses was seriously impeached or discredited on any major item of testimony that occurs to me.

1. *Failure to Provide Information.* During the two year period of negotiations, many instances have been developed in the evidence presented over a thirty-one day trial in which TWA failed or refused to supply information or to answer IFFA's questions. It may be assumed for purposes of decision that many of these denials of information were unjustified, and that the court, on timely application, would have required answers. For example, the court might well have required TWA to provide available economic information about other groups in the workforce. TWA seems generally to have treated these requests as irrelevant to the IFFA negotiations, at the same time, however, that it occasionally referred to the sacrifices the pilots had agreed to make.

The most notable omissions of specific information were the apparent failure to advise IFFA that (a) TWA's Flex Cap proposal would, in addition to saving some 45 "heads", also result in a major reduction in overtime ("incentive hours") estimated to save nearly $2 million annually, and (b) TWA's Bidding proposal would, in addition to saving some 120 "heads", also result in a reduction of incentive hours worth close to $6 million annually. *See* Exh. 529.

 In order to categorize a strike as an unfair labor practice strike rather than an economic strike it is necessary to find that the unfair labor practice in question probably *caused* or *prolonged* the strike. As previously stated, where the trier is forced to engage in "impermissible speculation and surmise," the Labor Board and the courts cannot impose the drastic remedies applicable to unfair labor practice strikes. *Soule Glass and Glazing Co. v. NLRB,* 652 F.2d 1055, 1089 (1st Cir.1981); *NLRB v. Columbia Tribune Publishing Co.,* 495 F.2d 1384, 1392 (8th Cir.1974) (unfair labor practice strike characterization requires that the illegal conduct be at least " 'a factor leading to the strike' "). In the present case it is not only speculative that the information sought would have prevented or shortened the strike, but it is entirely unlikely that more or better information would have materially helped avoid or shorten the strike. Lack of information did not trigger or unleash the strike.

TWA was seeking concessions valued at $88 million, although Carl Icahn spoke of $110 million (apparently including savings from the "Crew Complement" proposal that other TWA "numbers people" omitted as speculative, or too dependent on uncalculable circumstances). IFFA's public stance until well into the cooling-off period was that it would yield no more than $30 million (a 15% wage reduction or a lesser reduction combined with work rule concessions). Both parties ultimately spoke of a 17% wage reduction (some $34 million) on the eve of the strike, but it is impossible to glean from the testimony any appreciable likelihood of an IFFA offer of major work rule concessions that would approach the total saving of $88 million, or $110 million, or even the smaller amounts for which TWA might have settled. A TWA official, Hoar, may have said at one point that IFFA was offering $60 million, or he may have simply used the figure for argument, showing the parties were still far apart.[13] Tr. 4058. Even assuming the improbable $60 million figure, it seems that a strike was very likely, given TWA's strong insistence in March 1986 and thereafter on considerably larger concessions and the flight attendants' very strong resistance to the work rules changes.[14] It seems entirely

---

**13.** The latter interpretation is much more likely, as there are no documents confirming such a cost analysis of IFFA's most favorable offer, and IFFA's evidence, after months of discovery, does not permit a meaningful estimate of a saving of $20–25 million above the wage concession.

**14.** I recognize that the likely cost of a strike might well exceed the gap between the parties. This is a false comparison, however, as a triumph for TWA would save much more than the amount at stake for a single year. While I believe that Icahn's personal conduct on the eve of the strike and in a videotaped meeting with

unlikely that IFFA's leadership could have persuaded the membership to ratify a contract on TWA's last demands or undisclosed minimum terms, even if the leaders had concluded they could not prevail by striking. With commendable candor, Frankovich acknowledged that she now agrees with this conclusion. Tr. 4514. The pre-strike publicity, designed to achieve solidarity, was in a sense counterproductive.

The major omission from information supplied by TWA was the $6 million attributed to overtime savings if the TWA Bidding proposal were put into effect. If IFFA had had this figure, no change in negotiating stance was predictable. IFFA suspected that *more* than $88 million was TWA's objective, and the Bidding proposal saving was not concealed, but was part of the total repeatedly demanded and rejected in bargaining.

My confident conclusion that information concealment (and claimed misinformation) did not cause or prolong the strike does not signify that the legal duty to supply information is a dead letter. On the contrary, the doors to the courthouse remain open (unless blocked by the *Pacific Fruit* doctrine), and a request for information may be presented to the court as a discovery request. Simply collecting a series of unanswered questions over a two-year period of negotiations will not suffice to establish the existence of an unfair labor practice strike. Causation is lacking in this case.

■ 2. *ALPA Agreement.* The ALPA agreement that Icahn would use his best efforts to obtain a 20–22% concession by IFFA (Exh. 503 at 31) is not a fair subject of complaint. It was not a situation where TWA dealt with an unauthorized claimant to bargaining status. ALPA does not claim to represent the flight attendants but was cast in the role of an adversary seeking "nondiscrimination." While it might be argued that the agreement was against public policy, in that it tended to create rigidity in TWA's bargaining stance, it was not itself a rigid agreement. Much that occurred on both sides helped create rigidity. When Icahn obtained control of TWA he asked IFFA for a total concession of more than 22%, so the question became moot.

■ 3. *Training Program.* In preparation for the strike, TWA trained prospective strike breakers. The trainees were also available to replace voluntary retirees, if a buy-out proposal had been accepted. The trainees were not part of the flight attendant work group, and IFFA was not authorized to represent them until after the strike began and after TWA had obtained the right to use self-help. The training program does not seem to be an unfair labor practice. Negotiating parties must make some strike preparations before a strike is certain. IFFA took a strike authorization vote to strengthen the hand of its negotiators, even though such a vote may harden a party's position and make a strike more likely. Arguably contrary dicta on a related trainee issue in *ALPA v. United Air Lines, Inc.,* 614 F.Supp. 1020, 1043 (N.D.Ill.1985), has been superseded by an appellate decision giving legal approval to the training program in preparation for a strike. *ALPA v. United Air Lines, Inc.,* 802 F.2d 886, 916–7 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

■ 4. *Bargaining Tactics Generally.* A retreat in October and December 1985, from more favorable offers in May of 1985 is readily explicable, and does not tend to show a picador tactic simply designed to enrage the union and bring confrontation rather than agreement. Obvious differ-

pickets at his home shows a purpose to achieve agreement, through urgent warnings and impassioned arguments, the evidence does not tend to show that fear of a strike would have caused him to make major reductions in his demands. (The unpublicized personal attempt to persuade the pickets was an extraordinary performance, inconsistent with the union's theory that Icahn was engaged in a bad faith effort to ambush and destroy. Testimony about an in-flight discussion with flight attendants before the strike and an extended conversation with flight attendant Weingarten after the strike also demonstrates a very unusual personal attempt by the major owner of the airline to persuade, albeit by comments that the flight attendants found offensive and tactless.)

ences existed between May and December. Most significantly, TWA was under new ownership which was entitled to use a fresh and more radical approach to bargaining. The May stance was at a time when TWA was poised to obtain profitable summer traffic and could ill afford an interruption in service. By December, TWA's financial situation had darkened, supporting more drastic demands. Icahn's cash offer for minority stock was sharply reduced at about the same time. Exh. LLLL, p. 3. Also very significantly, TWA had made peace with ALPA and the IAM (showing that the Icahn-controlled airline was by no means hostile to reaching agreements with unions), leaving IFFA in a poor bargaining position. It had become the only union that might be called on for further sacrifice. TWA believed, accurately, that IFFA alone could not ground the airline.[15] Changed conditions justify a hardening of bargaining posture. *Soule Glass and Glazing Co. v. NLRB, supra,* 652 F.2d at 1103–4; *Omaha Typographical Union v. NLRB,* 545 F.2d 1138, 1143 (8th Cir. 1976). *Cf. Rockingham Machine–Lunex Co.,* 255 N.L.R.B. 89, 107, *affirmed,* 665 F.2d 303, 305 (8th Cir.1981), *cert. denied,* 457 U.S. 1107, 102 S.Ct. 2907, 73 L.Ed.2d 1316 (1982), where retraction of prior agreements was inexplicable, unless the company had given inadequate authority to its bargaining agent or the company was merely seeking to waste time.

Both sides on occasion engaged in posturing and immediate rejection of contentions by the other side, without discussion. The record of negotiations does not reflect well on the quality of negotiations. Both sides should have attempted to "reason together" more than they did. It is well settled, however, that movement toward the position of the other side is not a requirement of good faith bargaining. *NLRB v. American National Ins. Co.,* 343 U.S. 395, 404, 72 S.Ct. 824, 96 L.Ed. 1027 (1952); *Wal–Lite Div. of U.S. Gypsum Co. v. NLRB,* 484 F.2d 108, 111 (8th Cir.1973).

If the rule were otherwise, insincerity would be mandated by law, forcing parties to take positions and make first-offer assertions they do not really mean. While this may be common practice, by lawyers in litigation and otherwise, it is not the only permissible technique in collective bargaining.

Mere insistence on demands that seem extremely harsh to the other side and that a neutral party may consider "hard" is not a violation of bargaining duties. *Omaha Typographical Union, supra,* 545 F.2d at 1142. An employer may insist on positions consistent with its ability to survive a strike and its asserted needs, even if the union may consider the proposals greedy. *Wal–Lite, supra,* 484 F.2d at 111. As the Supreme Court acknowledged, speaking through Justice Black, the labor laws allow economic strength ultimately to control the establishment of contract terms, regardless of which side may have better reasons for its position. *H.K. Porter Co., Inc. v. NLRB,* 397 U.S. 99, 109, 90 S.Ct. 821, 826, 25 L.Ed.2d 146 (1970). The demands made by TWA were generally part of a long-standing pre-Icahn "wish list," apparently honestly advanced to meet perceived needs of TWA. Almost all of them were put into effect during the self-help period, and TWA's work rules changes became even more stringent during the strike, when TWA could reasonably believe, on the advice of counsel, that all contract restrictions had terminated.

Nothing done by TWA during the strike, from March 7 through May 17, can be said to have prolonged the strike. TWA was under no legal duty to move toward rather than away from IFFA's position, particularly as it became clearer day by day that IFFA's economic strength was fading. An earlier settlement might well have been possible if TWA had yielded to sentiments of business-as-usual or had sympathized more with its long-time employees. A simple increase in polite discussion, though

---

**15.** In companion litigation, I sensed as early as March 18, 1986, some ten days after the strike began, that IFFA was in "serious or desperate need of allies." *TWA v. IAM,* 629 F.Supp. 1554, 1558 (W.D.Mo.1986). Icahn's skepticism about how seriously IFFA could damage airline operations was first expressed in hard personal bargaining on August 2, 1985. Tr. 3948.

much to be desired, would not have broken the deadlock. IFFA had caused many millions of dollars of damage to TWA, and had vigorously "roasted" the new ownership. It is not a function of the court to insist that an employer cheerfully accept strike losses or show generosity in victory. A lawsuit should protect a party from the proven results of illegal conduct but does not serve as a safety net insuring against all forms of grievous injury.

The evidence relating to the period after IFFA called off its strike demonstrates a great deal of residual bitterness and possibly a gesture toward illegal interference in union affairs but sheds no material light on the questions now before the court. Although IFFA's contentions have been given a careful appraisal, I cannot conclude from the evidence presented that TWA's bargaining was in bad faith, under general principles articulated in this circuit some twenty years ago. *NLRB v. Arkansas Rice Growers Coop. Ass'n.*, 400 F.2d 565, 571–2 (8th Cir.1968); *NLRB v. Alva Allen Ind., Inc.*, 369 F.2d 310, 318–9 (8th Cir. 1966).

■ 5. *"Predictably Unacceptable" Demands.* IFFA argues that after the Icahn takeover of TWA the airline made, and insisted upon, demands that were predictably unacceptable to IFFA and its members. I consider this quite likely. Given the response to the membership questionnaire, the overwhelming strike vote, and the public relations campaign waged by IFFA with its members, it seems quite probable that the parties were headed toward an impasse unless TWA were to reduce its demands to the 20% range anticipated by Frankovich. Even though the proposal ultimately made by Icahn was below 20% in direct out-of-pocket demands, the total package sought was so unpopular with the flight attendants that the odds were heavily against acceptance.

IFFA contends that these factual conclusions brand TWA as a violator of legally imposed bargaining duties. While there are no such implications in Railway Labor Act cases, it is not difficult to find Labor Board opinions and an occasional court opinion seeming to condemn "predictably unacceptable" demands. The Labor Board's use of the concept has itself been criticized in a case denying enforcement to an order of the Board. *Seattle–First National Bank v. NLRB*, 638 F.2d 1221, 1226–7 (9th Cir.1981). The court said, "In finding a violation of the obligation to bargain in good faith based exclusively on contract proposals the Board is in effect doing that which it is prohibited from doing—sitting in judgment upon the substantive terms of a proposed collective bargaining agreement." *Id.* n. 7. It is "permissible for a party to engage in 'hard bargaining,' utilizing its economic power to its advantage to retain as many rights as possible" subject only to necessity that there be a subjective "desire to reach ultimate agreement." *Id.* n. 9. The *Wal–Lite* decision in the Eighth Circuit is another example of a case refusing to treat predictable unacceptability as a test of legality of proposals. 484 F.2d at 110.

On occasion, "egregious employer behavior," taken in context, may convince a trier of fact that the employer was spoiling for a fight rather than sincerely seeking satisfaction of its demands. *Soule Glass and Glazing Co. v. NLRB*, 652 F.2d 1055, 1104 (1st Cir.1981). An "egregiously deficient and one-sided 'proposed contract'" may have some evidentiary value in appraising the intent of a party.[16] *Id.* But a neutral

---

16. A good example of this phenomenon appears in *NLRB v. A–1 King Size Sandwiches, Inc.*, 732 F.2d 872 (11th Cir.1984), *cert. denied*, 469 U.S. 1035, 105 S.Ct. 508, 83 L.Ed.2d 399 (1984). Typically a proposal that tends to show there is no genuine desire to reach agreement reflects anti-union bias such as a proposal to "remain in total control over wages" or to demean the union function in a bizarre management rights clause. *Id.* at 875. *See also NLRB v. Wright Motors, Inc.*, 603 F.2d 604 (7th Cir.1979), for

proposals demeaning the union's role. One can search far in the Labor Act cases to try to find decisions turning on purely economic demands deemed to be excessive. In the present case, TWA initially proposed to stop paying union representatives and stop supplying union offices on its premises; its final proposal would continue the first subsidy but not the latter. While both issues were sensitive ones to IFFA negotiators, the proposals for *neutralizing* TWA's role could hardly be treated as demeaning, or hostile

party's distaste for the proposed terms cannot become a factor that has a life of its own. "Where the union cannot by the use of substantial economic weapons protected by the Act convince the employer to agree to terms acceptable to its members, the Board may not intervene to 'equalize or neutralize pressures in the name of lack of good faith.'" *Id. See also, e.g. Pease Co. v. NLRB*, 666 F.2d 1044 (6th Cir.1981), *cert. denied*, 456 U.S. 974, 102 S.Ct. 2238, 72 L.Ed.2d 848 (1982).

In any event, the appropriate judicial evaluation of proposed contract terms is not measured by how far the NLRB has been shown to penetrate into the central issues of bargaining. When Congress created the Labor Board, it established a body that it expected to develop considerable expertise in labor relations. Senate confirmation of the members of the Board tends to give assurance as to expertise and an opportunity to appraise biases or leanings of nominees. Quite different expectations apply to the hundreds of district judges nominated and then confirmed by the Senate. Labor relations expertise is rarely expected and the confirmation process seldom touches that subject. Even if it can be inferred that the Congress that created the Labor Board might have anticipated some indirect review by the Board of the substantive bargaining positions of unions and employers, it is inconceivable that the framers of the Railway Labor Act had such anticipations for the district judges.[17]

For present purposes I accept as a persuasive and authoritative ruling the decision of Chief Judge Peckham in *Trans Intl. Airlines v. Teamsters*, 96 LRRM 2763 (N.D.Cal.1977), *affirmed* in an opinion by then-Judge Kennedy, 650 F.2d 949 (9th Cir. 1980), *cert. denied*, 449 U.S. 1110, 101 S.Ct. 918, 66 L.Ed.2d 839 (1981). The union was there making demands that the airline contended would impose costs equal to a tripling of the flight attendant payroll. The union disputed the claim that there would be a cost increase estimated to be 294% but Chief Judge Peckham found it simply "unnecessary to the resolution [of the good faith bargaining issue] to determine the actual figures. TIA is effectively asking the court to hold that the sheer size of the Teamsters' economic demands, and the distance between the parties after a long period of negotiations, amounts to a lack of reasonable effort by the union to reach an agreement." 96 LRRM at 2765. The dis-

to the union, particularly where other airlines do not provide flight attendant union offices at airports. Tr. 5169–70. IFFA's response that IAM retained an office at airports does not show that the Icahn administration will not seek to recapture IAM's office as soon as possible, or that there is a definite parallel between the convenience to the two groups of having offices at the airports. Also lacking proof of a parallel situation is IFFA's contention that there was more favorable treatment of nonunion employees in the reductions made in late 1985. As IFFA argued in another context, before comparisons are convincing one must know whether the nonunion employees made comparable gains from 1978 onward. Whether their wages were higher than the market would also be pertinent. Invidious discrimination against union members in bargaining has not been established.

**17.** I am mindful that Justice Stone wrote, fifty years ago, that judges may be expected to have some capacity to decide whether Railway Labor Act negotiators have made a "reasonable effort to compose differences" because questions about "whether action taken or omitted is in good faith or reasonable are everyday subjects of inquiry by courts in framing and enforcing their decrees." *Virginian Rwy. Co. v. System Federation*, 300 U.S. 515, 548, 550, 57 S.Ct. 592, 600–601, 81 L.Ed. 789 (1937). If one is to equate reasonableness in contracting in all contexts, and view with suspicion what would be considered egregious or unconscionable as a generalized proposition, everyone knows that economic values fluctuate widely from time to time. A sharp and extensive gain or drop in interest rates, stock market prices, the value of farm land and other property, and even lawsuits is familiar. One reads that a $10 billion judgment, affirmed by a state Supreme Court, has been negotiated down to $3 billion. Perhaps the Congressional mandate that the service of employees shall not be considered a commodity (15 U.S.C. § 17) should be applied here, and perhaps some judges would opine that the cost of labor should not fluctuate drastically from year to year. Some might even agree with IFFA's counsel that adjustments upward should be distinguished from adjustments downward, because internal union politics make the latter especially difficult. I do not believe, however, and the precedents do not show, that the Railway Labor Act was designed to encourage judicially-created wage guidelines.

trict court concluded it was forbidden by "'the strong federal labor policy against governmental interference with the substantive terms of collective-bargaining agreements'" from pursuing the matter further. Judge Kennedy, on appeal, quoted the pertinent language. 650 F.2d at 958. While observing that it was not holding "that a union's insistence on proposals of the kind involved here could never be the basis for a finding that a union did not comply with its [bargaining] obligations," the appellate court concluded that the district court's finding is not clearly erroneous. *Id.* at 958–9.

If a contention that a union is insisting on a 294% increase in costs may be accepted for purposes of ruling, and a decision may summarily be made that such bargaining would not be unlawful, then even if it be assumed that TWA was bargaining for a decrease in cost of some 32%, including a 17% decrease in wages, that would not connote illegality in bargaining, regardless of poor prospects that the other party will accept the proposal. *See also REA Express, supra,* where bargaining likely to result in bankruptcy was not deemed illegally harsh.

In the present case, it seems unlikely there would have been a claim of illegally unreasonable proposals if the wage cut had been separated from the work rules proposals, and the two issues had been presented on separate occasions, perhaps on the amendment date of a one year contract. Since the proposals were different in nature, and only one dealt with take-home pay, it should not be deemed to be beyond the range of reasonableness to insist on dealing with the entire perceived problem at once, particularly with a buy-out proposal for flight attendants who might be unwilling to work under the new conditions. In any event, if *TIA* is sound, as I believe it to be, and an aggressive union may lawfully bargain for a tripling of expenses for a flight attendant group believed to be working in substandard conditions, the converse should be true, and an aggressive employer should be able to lawfully bargain for a 50% reduction in total expenses of a group believed to be considerably overpaid and much less productive than is feasible.[18]

IFFA urges, however, that the court consider the totality of the circumstances. As previously concluded, the troubles at the bargaining table and other complaints do not match or tend to outweigh the unusually strong evidence that TWA, under Icahn's leadership, has a high propensity toward making collective bargaining agreements in general (with ALPA and IAM) and was "passionately" eager to make such an agreement with IFFA on the eve of the strike. Short of making his proposals more palatable (which cannot be insisted upon by the courts) there was little more that Icahn could have done to demonstrate desire for a contract.

■ 6. *Alleged Sex Discrimination in Negotiating Demands.* One of the most challenging issues presented in this case is whether TWA, through Carl Icahn, made concession demands that were so tainted with sex stereotyping that IFFA's resistance to the point of striking was specially privileged and guaranteed against loss, in order that a discriminatory sex-based differential not be imposed.

TWA contends the court has no jurisdiction over this claim in this case. Sex discrimination charges are being processed by the EEOC and state agencies, and at least one separate lawsuit has been filed. The court's initial ruling on March 5, 1986, suggested that exhaustion of administrative remedies might be needed. I was then thinking more of a claim of sex discrimination by persons actually employed under the new wage system rather than a claim of discrimination as an element in the claim

---

18. It is of interest (as a tacit admission) that Frankovich gave no assurances to the flight attendants in advance of the strike that TWA's offensive package of demands would result in their being treated as unfair labor practice strikers, entitled to displace new hires after a strike. Exh. 512. The 16 page outline contains no express concession that they would be economic strikers, but it offers no hope of other treatment. Contrast the optimistic legal assertion that junior crossovers would be subject to bumping by strikers having seniority, a contention of some novelty and daring that may be in the process of fulfillment.

of bad faith bargaining. Further consideration has been given to the latter issue.

It has been held that a refusal by an employer to bargain in good faith over claims of racially discriminatory practices can violate the National Labor Relations Act, and a strike caused by such a refusal can be classified as an unfair labor practice strike. *United Packinghouse, Food & Allied Workers Int. Union v. NLRB*, 416 F.2d 1126, 1133 (D.C.Cir.1969), *cert. denied*, 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969). Footnote 11 in that case rejects the notion that exclusive primary jurisdiction lies with the EEOC. In a later Labor Board case involving claims of sex discrimination, it was contended by the union that management was insistent on retaining the right to discriminate against women by paying men an incentive to attract and retain them as employees. The majority of the Labor Board concluded there had been no employer refusal to bargain when the union representative "walked out of the initial bargaining session when told the (employer) was firm about retaining" the right to continue the practice. *Jubilee Mfg. Co. and United Steelworkers of America*, 202 N.L.R.B. 272, 274 (1973), affirmed without opinion, 504 F.2d 271 (D.C.Cir. 1974). Member Fanning concurred on the merits, concluding the evidence of sex discrimination was inadequate. Member Jenkins dissented, however, on the merits, concluding that proof that the incentive was used because "men are generally 'breadwinners'" showed an unlawful motivation and thus bad faith bargaining.

While there is something to be said for TWA's view that primary jurisdiction lies with the EEOC, I conclude that I do have jurisdiction to examine the claim as an element in an assertion of bad faith bargaining.

It seems reasonably clear that, beginning with its proposals in December 1985, the TWA negotiators were acting under the direction of the incoming owner, Carl Icahn. Therefore, bargaining statements made by Icahn in August 1985 may well reflect the basis of TWA's position from December through the strike. TWA's contention that Icahn did not speak for it in August 1985 is of course sound, and could not have resulted in Railway Labor Act violations prior to Icahn's achievement of control, but the statements tend to disclose his thinking after he became TWA's owner. His initial demand in June for parity of sacrifice by ALPA, IAM and IFFA may also be considered.

Critical discussions occurred between Icahn and Frankovich in August 1985. According to her testimony, she expressed willingness to yield 15 or 17% in wages, somewhat more than the IAM did in its negotiations with Icahn, but Icahn then insisted on concessions of 20–22% of total flight attendant costs. When Frankovich protested the substantial differential, Icahn used various arguments set forth on pages 1009–10 of this opinion. He said the market was different for flight attendants and mechanics.[19] Tr. 3944. He said a "girl" (of indeterminate age) outside his window could be a flight attendant and would accept a $12,000 annual wage. Tr. 3945. IFFA seems to have agreed with the evaluation of beginning flight attendants' work, as it offered essentially the same yearly wage in its "B scale" contract proposal. Exh. 49, p. 3. Icahn said mechanics were different; among other things they were "breadwinners." IFFA workers in many instances simply provided "second incomes." Tr. 3947. He repeatedly emphasized, before and during the strike, that large numbers of unskilled young people were willing and able to become flight attendants.

The "breadwinner" reference was particularly resented and has been cited repeatedly to show an intent to discriminate against women. If truly a basis of decision, IFFA would doubtless be right.

---

**19.** This was repeatedly asserted, and I believe it must have been the essential reason for the differential, in addition to the sheer economic power of the IAM to enforce its demands in a confrontation. At the end of the strike, some nine months after the August 2 conversation, Icahn was still repeating the theme that flight attendants were not "professionals" (Tr. 5477), an awkward way of saying again that unskilled persons could be employed for the job.

"Breadwinner" stereotypes have been outlawed as grounds for governmental action since *Frontiero v. Richardson*, 411 U.S. 677, 681, 93 S.Ct. 1764, 1767, 36 L.Ed.2d 583 (1973). If a private employer were to establish a wage scale favoring men because of such a theory, it would doubtless violate Title VII of the Civil Rights Act of 1964. *E.g., Hall v. Ledex, Inc.*, 669 F.2d 397, 399 (6th Cir.1982). The result in *Hall* is not obviously sound, however, as the male employee who received favorable wages actually did have greater family needs than the disfavored woman who succeeded him. Presumably the court had heard no evidence that the employer made a general practice of paying its employees in accordance with the size of their families. The argument was seen as a poor excuse for what was otherwise inexplicable, and the situation was therefore interpreted as an instance of sex discrimination. In the present case I also believe it is implausible to suppose that TWA actually used a test of comparative need (as perceived by stereotype) in establishing wages, but unlike the *Hall* situation there are likely innocent alternatives to sexist wage determination.

A "breadwinner" remark, as in *Hall*, is occasionally treated as an earmark of sexist bias. *Grove v. Frostburg Nat. Bank*, 549 F.Supp. 922, 941 n. 15 (D.Md.1982). In other cases, a "breadwinner" comment may be taken as a mere rationalization, an unsophisticated and crude but sometimes well-meaning debating point attempting to explain disparate wages. *EEOC v. Affiliated Foods, Inc.*, 34 FEP Cas. 943, 948 (W.D.Mo.1984); *Briggs v. City of Madison*, 536 F.Supp. 435, 448–49 (W.D.Wis.1982). In at least one recent case, a breadwinner theory of the male role has been accepted as a sociologically valid theory that was by-and-large true in our society, thus offering a "logical explanation" of statistics showing a pattern of promotions favoring males (who tend to acquire more uninterrupted seniority). *Gillespie v. Bd. of Ed. of North Little Rock*, 528 F.Supp. 433, 437 (E.D.Ark.1981), *aff'd.*, 692 F.2d 529 (8th Cir.1982). *Cf. Haskins v. Sec. of HHS*, 35 FEP Cas. 256 (W.D.Mo.1984) (sustaining claim that a policy excluding credit for *interrupted* seniority has a tendency to discriminate against women).

■ My interpretation of the exchange between Mr. Icahn and Ms. Frankovich is much like the interpretation I gave the term in the *Affiliated Foods* case. I consider it a mere rationalization for action taken on other grounds. Icahn was engaged in debating, and apparently became angry or lacked the sophistication to realize he was likely to antagonize rather than convince Frankovich by the breadwinner reference. The real reasons for the IAM differential, in normal economic terms, must have been (1) the ability of IAM to do greater damage to TWA in a strike than IFFA could (a fact conceded by union bargaining representative Hoffman—Tr. 3569),[20] and (2) the perception that persons in the mechanics' bargaining unit are generally more skilled, at least initially, than would be expected of a newly hired flight attendant. Tr. 3946. The available supply being deemed somewhat smaller for mechanics, they succeed in commanding better compensation.[21] In any event, IFFA has not attempted to prove a comparable worth case.[22]

**20.** While I do not rely on such testimony in this case for several reasons, I have heard testimony under oath that the IAM was capable of crippling the airline. *TWA v. IAM*, 629 F.Supp. 1554, 1557–58 (W.D.Mo.1986).

**21.** Icahn's perception that $12,000 offers for a "glamorous job" (Tr. 3945) would likely attract large numbers of young persons wanting "to see the world," as the Navy used to say, and that young women would predominate, was realistic rather than sexist. Women comprise about 85% of the flight attendant workforce.

**22.** There is one indication that the thrust of IFFA's claim is directed less toward mechanics in general than toward an alleged past practice of TWA to overpay "janitors." Tr. 3947. There is an indication that as of June 1984 *minimum* pay for IAM janitors was $12.37 per hour, apparently exceeding $25,000 per year (Exh. 537), approximately twice the wage scale that IFFA itself proposed for new flight attendants. It is not shown what work "janitors" do, or whether they are exclusively or predominantly a male group. Assuming arguendo that the group referred to is largely male (as Icahn seems to have assumed) and is overpaid by TWA, this seems

IFFA's theory, that the breadwinner reference reveals Icahn's motivation, would signify that he is a devotee of the Marxist or utopian distribution system, "to each according to his needs." While even normally doctrinaire capitalists may be influenced by such motivations occasionally in setting wages for persons in their immediate entourage, it is entirely implausible that a hard-boiled "corporate raider" (to use the label of the Court of Appeals) would subscribe to that method of setting wages for middle income personnel. When Icahn ultimately acknowledged that some flight attendants really did need the old wage-rates, he said they must "accept the realities here." Tr. 4023. That statement reflects probable thought processes, and I believe it to be the key to this controversy. There has been no persuasive showing that sex stereotyping governed or influenced Icahn's economic demands—only his rationalizations.

■ 7. *TWA's Seniority Proposal.* IFFA's final contention is that TWA insisted on a nonmandatory subject of bargaining and that the resulting impasse was thus caused by an unfair labor practice. The subject in question relates to the seniority of former flight attendants who may be promoted to supervisory positions and who later seek to resume their status as flight attendants.

Both parties to negotiations sought to change the provision in the most recent contract (Red Book), under which seniority accrues for one year after a promotion and then is retained but without enhancement. Article 10(C), pp. 73–4. IFFA sought to terminate the seniority rights of supervisors who had been promoted from the ranks (Exh. 123, p. 16, Exh. 143); TWA sought to have seniority accrue past the one year period. Exh. 6, p. 5. TWA's motivation was to increase the attractiveness of supervisory positions by giving greater job security to former flight attendants who become supervisors.

While positions on a union's seniority list may generally be a nonmandatory subject of bargaining, both under the RLA and the NLRA, once an agreement has been made it would seem to be a duty of both parties to consider proposed amendments. IFFA would hardly take the position that TWA could legally refuse to discuss IFFA's proposed deletion of the provision. An Icahn statement, to which IFFA takes exception, fairly relates to his resistance to IFFA's demand and not to adamant insistence on TWA's proposal. Exh. 297. In any event, while the parties were both interested in the subject and it may have been the topic of strong language, nothing convinces me that it had anything to do with the impasse, or that an impasse would have resulted if all else had been agreed. There is, in addition, a credible denial of such an intent. Icahn Depo. 451, 453–5.

CONCLUSION

It is doubtful that Icahn adequately appreciated the cost of his proposals in human terms. Perhaps, as the IFFA witnesses suggest, he did not greatly care. He may well have seriously underestimated TWA's need for the skills of flight attendants with many years of experience. No misjudgment that may be assumed for purposes of this ruling would, however, violate the Railway Labor Act. Greedy employers, like greedy unions, have a legal right to try their strength, and to enforce demands by self-help, after release from supervised negotiation.

I conclude that the "breadwinner" statement was a foolish and offensive rationalization, having no probable relationship with Icahn's true rationale for demanding disproportionate concessions from IFFA. I

---

unlikely to be attributable to their sex. Rather, the linkage to a union with apparent clout at TWA seems to be the most rational explanation from the present record. Absent another inference reasonably drawn from the evidence, a presumption of lawful conduct may be used. *NLRB v. Alva Allen Ind., supra,* 369 F.2d at 319. *See also Powell v. Mo. State Hwy. and Transp.*

*Dept.,* 822 F.2d 798 (8th Cir 1987), accepting a bench trial conclusion that an employee's work record and not proven expressions of supervisory bias show the most probable cause of a discharge. Resolution of such questions by court or jury necessarily turns on a common sense appraisal, based on observations of human nature and conduct.

am not persuaded by a preponderance of the evidence before me that the predominate sex of IFFA's work force was a cause of its present misfortune.